UNITED STATES of America, Appellee,

v.

Regis PRICE, Appellant.

No. 84–5055.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1985.

Decided June 6, 1985.

Robert O. Lampl, Pittsburgh, Pa. (Janice L. Morison, Pittsburgh, Pa., on brief), for appellant.

Marye L. Wright, Asst. U.S. Atty., Charleston, W.Va. (David A. Faber, U.S. Atty., Charleston, W.Va., on brief), for appellee.

Before HALL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

K. K. HALL, Circuit Judge:

Regis Price appeals his jury convictions on three counts of making, and aiding and abetting the making of, false statements to a federally insured bank, in violation of 18 U.S.C. §§ 1014[1] and 2. Finding his appeal to be without merit, we affirm.

### I.

In the fall of 1982, Regis Price, his former wife, Debbie Price, John Buyce, and Andrew P. Davis moved to Charleston, West Virginia, to promote a dining club. During their first few weeks in Charleston they organized and promoted the Executive Dine Out Club. Memberships sold for $34.95 apiece and members received two meals for the price of one at certain designated restaurants in Charleston. Each restaurant was to receive a payment of $2.00 to $3.00 per member in the Club.

The Executive Dine Out Club operated legitimately, but not well enough to provide sufficient money to satisfy the group. Defendant and the others then organized the Greater Charleston Supper Club. This second club was incorporated and an advertising campaign was conducted beginning around Thanksgiving of 1982. Memberships in this club were sold for $29.95. Prior to the advertising campaign, John Buyce, using the alias Samuel Lawrence, opened a checking account for the Greater Charleston Supper Club at the Bank of St. Albans, a federally insured member of the Federal Deposit Insurance Corporation ("FDIC"), in St. Albans, West Virginia. He also arranged for the Supper Club to accept payments by credit card for the memberships. The receipts from the sales of memberships, in the form of cash, money, and credit card sales receipts, were deposited in the checking account at the Bank of St. Albans.

After the Supper Club was organized, John Calvert joined the enterprise, and, along with Buyce, the Prices, and Davis, decided to manufacture false credit card sales receipts. Debbie Price left Charleston shortly after this decision was made, and between December 20 and December 22, 1982, Buyce, Regis Price, Davis, and Calvert manufactured hundreds of false and fraudulent credit card sales receipts. Defendant Price, Calvert, and Davis filled in most of the names, credit card numbers, and amounts of sale by writing this information on the credit card sales receipts.

---

**1.** 18 U.S.C. § 1014 makes it a crime to "knowingly mak[e] any false statement or report, or willfully overvalu[e] any land, property or security, for the purpose of influencing in any way the action of" described financial institutions, including federally insured banks "upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor...."

The names were taken from a Charleston telephone directory. The credit card numbers and amounts of purchase were all fictitious. The bogus sales receipts were run through a credit card imprinter, which imprinted the name "Greater Charleston Supper Club" on the receipts. After the false credit card sales receipts were made, Buyce, Davis, and Price assembled them into three deposits, adding up the amounts of the credit card sales receipts and other receipts, and entering those amounts on deposit slips, which were then deposited into their account at the Bank of St. Albans. The total amount of false receipts deposited at the bank was $45,294.20.

Two different deposits of the bogus sales receipts were made during the day of December 22, 1982. On the morning of December 23, 1982, Buyce, Davis, Calvert and defendant Price returned to the Bank of St. Albans where they made a third deposit of false receipts. At the same time that day to withdraw another $17,000 was refused by the bank's Vice-President. The four men then left the state. The evidence reveals that Price received $300.00 of the funds withdrawn from the bank.

In April, 1983, Regis Price was charged in a five-count indictment with one count of conspiring to obtain money by the use of fraudulent credit card sales receipts (Count One), in violation of 15 U.S.C. § 1644(a); three counts of making, and aiding and abetting the making of, false statements to a federally insured bank (Counts Two, Three and Four), in violation of 18 U.S.C. §§ 1014 and 2; and one count of transporting and aiding and abetting the transportation across state lines of fraudulently obtained funds with a value in excess of $1,000 (Count Five), in violation of 15 U.S.C. § 1644(d) and 18 U.S.C. § 2.[2]

Following a jury trial, Price was acquitted of the charges contained in Counts One and Five but was convicted of the false statement charges contained in Counts Two, Three and Four. This appeal followed.

## II.

On appeal, Price contends that his acquittal on the conspiracy count precludes his convictions of aiding and abetting the making of false statements to a federally insured bank. Appellant also argues that the district court lacked subject matter jurisdiction because the offense which was the basis of his convictions is not cognizable under 18 U.S.C. § 1014. Finally, Price submits that the evidence fails to support his conviction of three separate violations of 18 U.S.C. § 1014. We disagree with all of these contentions.

## III.

According to Price, he cannot be prosecuted for conspiracy and the substantive offense in this case, because the substantive offense of aiding and abetting constitutes a lesser included offense of the conspiracy count. We can find no precedent to support Price's argument that aiding and abetting the making of false statements is a lesser included offense of conspiracy. Consequently, we reject this contention as meritless. Moreover, we agree with the government that, given the ample evidence in the record to support the jury's verdict of guilty on the substantive counts, any inconsistency between that verdict and Price's acquittal of conspiracy must fail. Cf. United States v. Powell, — U.S. — 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (defendant's acquittal of conspiracy to possess cocaine and possession of cocaine does not merit reversal of conviction of using the telephone to facilitate those offenses, despite the fact that the verdicts are inconsistent).

## IV.

Price next contends that aiding and abetting the deposit of false credit card

---

**2.** Buyce and Davis, who were indicted along with Price, entered into plea agreements with the United States and testified against defendant at trial. Debbie Price was also indicted. She was a fugitive from justice at the time of defendant's trial and the United States subsequently dismissed the indictment against her.

receipts in a federally insured bank does not constitute the making of a false statement within the meaning of 18 U.S.C. § 1014. In *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), the Supreme Court held that depositing "bad checks" in federally insured banks is not proscribed by 18 U.S.C. § 1014.[3] Concluding that a check is literally not a statement at all, the Supreme Court reasoned as follows:

> Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance.

*Id.* 102 S.Ct. at 3092.

We are unconvinced by Price's argument that under *Williams* the deposit of false credit card sales receipts, like the deposit of "bad checks," is not a chargeable offense under 18 U.S.C. § 1014. In our view, this case is vastly different from the situation in *Williams*. Here, the government never alleged that the credit card sales receipts themselves were statements. Instead, the government proved that false statements, in the form of fictitious credit card numbers and amounts of purchase and names obtained from telephone books, were written onto the receipts. Thus, un-

like the checks in *Williams* which carried with them no representation, express or otherwise, as to the drawer's account balance, the credit card sales receipts in this case carried with them express false representations concerning the credit card account numbers, the account owners, and the amounts of purchase. It was these false statements which Price and the others used in order to obtain cash from the bank to which they were clearly not entitled.[4]

Defendant's conduct is akin to forgery, and certainly, there is nothing in *Williams* that equates the passing of checks drawn on accounts with insufficient funds with fraudulently making or altering a document. We conclude that the conduct in this case clearly falls within the ambit of § 1014.

### V.

■ Finally, we can find no merit in Price's remaining contention that he merely helped prepare one set of false credit card sales receipts and that, at most, he can be convicted of one offense. As the government points out, Price has waived any right he may have had to challenge the multicount indictment on grounds of multiplicity or duplicity by failing to raise this issue below prior to trial. Fed.R.Crim.P. 12(f).[5] We can find no showing of cause which would warrant relieving Price of the consequences of this waiver. Moreover, the evidence reveals that more than one credit card sales receipt was falsified by defendant, and all of the falsified receipts were placed in three different bundles. Each time a bundle of the bogus receipts was submitted to the bank for deposit, a sepa-

---

3. "Bad checks" are those checks drawn on an account lacking sufficient funds to cover them and are not forged or altered checks.

4. Moreover, defendant does not challenge that portion of the trial court's charge, instructing the jury that the credit card sales receipts constituted "commitments" to assume a financial obligation at a future date within the meaning of § 1014.

5. Fed.R.Crim.P. 12(f) provides that:

> Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

Fed.R.Crim.P. 12(b) requires that defenses and objections based on defects in the indictment be raised prior to trial.

rate crime was committed, inasmuch as each submission constituted a different transaction. Consequently, Price's argument must fail.

## VI.

For the foregoing reasons, defendant's convictions for violating the provisions of 18 U.S.C. §§ 1014 and 2 are affirmed.

AFFIRMED.