**UNITED STATES of America, Appellee,**

v.

**Richard Emerson BONNETTE, Jr., Appellant.**

**No. 84–6168.**

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1985.

Decided Jan. 7, 1986.

Eric Wm. Ruschky, Asst. U.S. Atty. (Henry Dargan McMaster, U.S. Atty.), Columbia, S.C., for appellee.

David G. Ingalls, Spartanburg, S.C., for appellant.

Before WIDENER and ERVIN, Circuit Judges, and WALTER E. HOFFMAN, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

**WALTER E. HOFFMAN, Senior District Judge:**

Richard Emerson Bonnette, Jr., moved, pursuant to 28 U.S.C. section 2255,[1] to vacate his convictions for bank fraud, relying on an interpretation of the statute under which he was convicted, 18 U.S.C. section 1014,[2] in a case decided by the United States Supreme Court after Bonnette's convictions had become final. The government responded with a motion for summary judgment, which the district court granted. We affirm.

## I.

### FACTS

The facts are not in dispute. Bonnette was an attorney practicing in Lexington, South Carolina, at the time of the events leading to his indictment on five counts of bank fraud in violation of 18 U.S.C. section 1014 and on ten counts of mail fraud in violation of 18 U.S.C. section 1341.[3] He was convicted by a jury on all counts in a seven-day trial over which Judge Charles E. Simons, Jr., presided.

The opening chapter of this unfortunate tale occurred in March 1974 with the incorporation of Capital City Auto Auction, Inc. ("Capital City") in Lexington. This automobile auction business was incorporated by Bonnette's co-defendant, Eugene Jones, and two other persons. Bonnette handled the details of the incorporation and became corporate secretary.

Capital City auctioned used cars, charging the seller $10 to auction a car and an additional fee if the car was sold. Buyers

---

1. 28 U.S.C. section 2255 permits "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... [to] move the court which imposed the sentence to vacate, set aside or correct the sentence."

2. 18 U.S.C. section 1014 makes it a crime to "knowingly mak[e] any false statement or re-

port, or willfully overvalu[e] any land, property or security, for the purpose of influencing in any way the action of [certain specified financial institutions, including banks with deposits insured by the Federal Deposit Insurance Corporation], upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan...."

3. Bonnette does not seek collateral review of his convictions for mail fraud.

that were dealers could pay by "sight draft"[4] rather than by check or by cash. After taking a dealer's sight draft, Capital City would write a check drawn on its account at the Lexington State Bank ("Lexington"). Capital City then would deposit the sight draft in the dealer's account at Lexington, having attached to the sight draft the title to the car sold. Lexington credited Capital City's account immediately on deposit of the sight drafts.

Bonnette approached another Lexington bank, Citizens & Southern Bank ("Citizens & Southern"), in May 1978. He opened an account with Citizens & Southern for the Draft Acceptance Corporation, a subsidiary of Capital City. The dealer sight drafts thereafter were deposited into this account, for which Citizens & Southern would extend immediate credit rather than postpone credit until the funds for the drafts were collected. Citizens & Southern hesitated when Bonnette initially proposed this procedure, but agreed to it after Bonnette assured the bank that only credit-worthy drafts from reputable dealers would be deposited in the account.

A major portion of the drafts deposited in the Citizens & Southern account were neither credit-worthy nor from reputable dealers. Bonnette or others at his direction deposited in the account drafts attached to titles representing cars that allegedly had been sold to Hornsby's Used Cars and Capital City Chevron & Auto Sales. In fact, employees of Capital City established and operated these businesses solely to give Capital City a purchaser through which to fake automobile sales. Drafts from these nonexistent sales, as well as drafts attached to titles from cars no longer in Capital City's inventory, were steadily deposited in the Draft Acceptance Corporation account.

On April 2, 1979, Citizens & Southern told Bonnette that credit no longer would be extended on the sight drafts, the Bank having realized that over $330,000 in funds remained uncollected. The indictment and convictions of Bonnette and Jones followed.[5] Bonnette appealed his convictions to the United States Court of Appeals for the Fourth Circuit, challenging only the sufficiency of the evidence. The Fourth Circuit affirmed the convictions, and the Supreme Court denied review. *United States v. Bonnette*, 663 F.2d 495 (4th Cir. 1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982).

On March 11, 1982, Bonnette filed a Rule 35 motion for the reduction or modification of his sentence. Initially, he grounded the motion in the disparity between his sentence and that of his co-defendant Jones. *See supra* note 5. While the motion was pending, the Supreme Court in *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), reversed a conviction under section 1014 for "check-kiting," which Bonnette's counsel then urged as an additional basis for granting the motion. Chief Judge Robert W. Hemphill, who had sentenced Bonnette, denied the motion on

---

4. "A *draft* is an unconditional order in writing addressed by one person to another, signed by the person giving it (drawer), directing the person to whom it is addressed to pay at sight, on demand, or at a definite time, a sum certain in money, either to the order of a specified person (named payee) or to bearer. Usually (but not always), the payee and the drawer are the same person. The party to whom the draft is addressed is the drawee." J. Vergari, *Negotiable Instruments and the Payments Mechanism* 27 (1976).

In a typical transaction involving a sight draft, the seller's bank does not credit the seller's account until the proceeds represented by the sight draft are collected. *See* W. Weber & R. Speidel, *Commercial Paper in a Nutshell* 28–29 (1982).

5. Jones pleaded guilty to one count of bank fraud in a plea agreement for which the fourteen other counts against him were dismissed. Jones and Bonnette were sentenced on the same day by the late Chief Judge Robert W. Hemphill. Jones received a sentence of six months in a pre-release facility as a condition of a two-year probationary sentence. Bonnette received a one-year sentence on each of the first four counts, to be served consecutively. These counts represented certain of the bank fraud counts against Bonnette, all of which involved numerous sight drafts. The remaining bank fraud count, as well as all of the mail fraud counts, were suspended, with a five-year probationary sentence to begin after the four-year sentence had been served.

September 7, 1982. In his order, Judge Hemphill distinguished the facts underlying Bonnette's convictions on the bank fraud counts from those underlying the defendant's convictions for bank fraud in *Williams*.

Bonnette filed, on July 7, 1983, a motion to vacate his sentence under section 2255, also requesting release from incarceration pending a decision on his motion. He again relied on *Williams* as well as a Fourth Circuit case, *United States v. Carlisle*, 693 F.2d 322 (4th Cir.1982), which reversed the convictions under section 1014 based on *Williams*.[6] The government moved for summary judgment. Having previously denied Bonnette's motion for release on bail, the district court granted the government's motion for summary judgment on

the recommendation of the magistrate. Both the magistrate's report and the district court order distinguished *Williams* as a case of pure check-kiting,[7] unlike the events underlying Bonnette's convictions, which involved assertions—express and implied—that the title-attached drafts were worth what they were represented to be worth. Bonnette appeals from the district court order granting summary judgment, arguing that the interpretation of section 1014 in *Williams* makes his convictions under that section invalid.

## II.

## APPLICABILITY OF "CAUSE" AND "ACTUAL PREJUDICE" STANDARD

A threshold question, not addressed by the district court but argued by the govern-

---

6. The four grounds Bonnette states in support of section 2255 relief are as follows:

(1) New case law establishes that the acts for which Bonnette was convicted are not criminal;

(2) Section 1014, as applied to Bonnette, is vague;

(3) The court improperly charged the jury that a check or a draft is a "security" within the meaning of section 1014, and that a section 1014 violation resulted necessarily if the jury found check-kiting to have taken place;

(4) No section 1014 violation occurred, not only because the sight drafts presented to Citizens & Southern were not "statements" within the meaning of the section, but also because the bank did not rely on the titles attached to the sight drafts in extending immediate credit before collection.

All of these grounds in essence hinge on the narrowed construction of section 1014 in *Williams* and, thus, restate in different terms the first ground—the changed interpretation of section 1014. Nonetheless, the magistrate's report and the district court's order addressed the other grounds. The district court rejected the vagueness challenge because movant did not support this ground. *United States v. Bonnette*, Civ. No. 83–1555–6; Crim. No. 79–257, slip. op. at 5 (D.S.C. Feb. 29, 1984) ("This court cannot credit Bonnette's unsupported argument that he as a practicing attorney was victimized by the vague language used by the Congress in proscribing the types of misconduct described in § 1014, which has existed in some form for many years.") (Footnote omitted). The challenge to the court's instructions regarding check-kiting also was rejected. The district court observed that its instructions were given to clarify references to check-kiting made at

trial, "but at no point was it told that any draft without evidence attached of a vehicle sale could be considered as a 'statement' that funds were on deposit to cover the items." *Id.* at 8 (footnote omitted).

7. The Supreme Court in *Williams* described the concept of check-kiting in a footnote:

As the Government explains, a check-kiting scheme typically works as follows: "The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection.

"By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks...." *Williams*, 458 U.S. at 281 n. 1, 102 S.Ct. at 3089 n. 1 (quoting Brief for United States at 12–13).

ment on this appeal, is whether Bonnette has shown the elements of cause and actual prejudice necessary to support section 2255 relief. The Supreme Court established in *Frady v. United States*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), that the appropriate standard for review of a section 2255 motion is the "cause and actual prejudice" standard: "Under this standard, to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *Id.* at 167–68, 102 S.Ct. at 1594.

Assuming actual prejudice, an interesting question arises whether a nonconstitutional change in the law can satisfy the *Frady* cause requirement. *Cf. Stone v. Powell*, 428 U.S. 465, 477 n. 10, 96 S.Ct. 3037, 3044 n. 10, 49 L.Ed.2d 1067 (1976) ("Even those nonconstitutional claims that could have been asserted on direct appeal can be raised on collateral review only if the alleged error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice' ") (quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)) (internal quotation marks omitted); *Kerr v. Finkbeiner*, 757 F.2d 604 (4th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 263, 88 L.Ed.2d 269 (1985) (same). *But cf. Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974) (holding cognizable under section 2255 a nonconstitutional claim, which had been raised on direct appeal, involving a change in the controlling law of a federal circuit).

The initial question in fleshing out this analysis is whether Bonnette could have argued, on direct appeal, the interpretation of section 1014 that he now advocates. At the time that he was tried and convicted in May 1980, a conflict of sorts existed in two federal circuits over the proper interpretation of section 1014. The United States Court of Appeals for the Fifth Circuit had departed from the reading of section 1014 taken by a district court in another federal

circuit. *See United States v. Payne*, 602 F.2d 1215 (5th Cir.1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980) (rejecting *United States v. Edwards*, 455 F.Supp. 1354 (M.D.Pa.1978)). In *Edwards*, the United States District Court for the Middle District of Pennsylvania held that presentation of a worthless check to a federally insured bank was not proscribed by section 1014, the same result later reached by the Supreme Court in *Williams*. Another district court within the Third Circuit followed *Edwards* in a decision issued on January 9, 1981, four months before Bonnette's case was argued on direct appeal before the Fourth Circuit. *See United States v. Sher*, 505 F.Supp. 858 (W.D.Pa.1981). About three weeks before Bonnette's argument on direct appeal, the United States Court of Appeals for the Third Circuit noted the conflict in a footnote, *see United States v. Pinto*, 646 F.2d 833, 838 n. 14. (3d Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 94, 70 L.Ed.2d 85 (1981), although an outright split in the circuits did not exist until August 14, 1981, when the Third Circuit affirmed the district court in *Sher*, *see* 657 F.2d 28 (3d Cir.1981), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982).

The effect of developments in the law on the availability of collateral review more often has dealt with constitutional claims. The inquiry generally has been framed in terms of whether a constitutional claim is novel, thus supporting the cause requirement of the cause-and-prejudice standard. *Compare Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (burden of proof claim based on due process held not novel, and thus insufficient to show cause, when trial occurred after Supreme Court decision, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)) *with Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984) (similar burden of proof claim held novel, and thus sufficient to show cause, when trial occurred before *Winship*). *See also Wilson v. Procunier*, 747 F.2d 251 (4th Cir.1984), *cert. denied sub nom. Wilson v. Sielaff*, — U.S. —, 105

S.Ct. 1206, 84 L.Ed.2d 348 (1985) (observing that *Engle* and *Reed* set up a bright-line test for determining the novelty of a burden of proof claim stemming from *Winship*).

■ Bonnette may not be capable of establishing cause because the interpretation of section 1014 that he now asserts could have been argued at his trial and on appeal. Although line-drawing is best done at the Supreme Court level, decisions by lower courts can provide the basis for an argument that, if not raised, may remove cause for collateral relief. *See Watters v. Hubbard*, 725 F.2d 381 (6th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984) (failure to establish cause because federal circuit court decisions had recognized the fifth amendment implications inherent in admissions to examining psychiatrists); *cf. Reddick v. Callahan*, 587 F.Supp. 880 (D.Mass.1984) (lack of cause for burden of proof claim because petitioner could have objected at trial based on *Winship*, decided two months before his trial, and could thereafter have argued the issue on appeal). Nevertheless, we need not rest our decision on Bonnette's failure to argue a point that would seem to have been in his best interest to argue because we have concluded that, in any event, *Williams* does not establish any error in Bonnette's convictions even if the case applies retroactively.

### III.

### RETROACTIVITY OF WILLIAMS

■ Retroactivity of judicial decisions is by no means a matter of course. Even when the Supreme Court declares a law or practice unconstitutional, the decision can be denied retroactive effect. *See, e.g., Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984) (declining to apply retroactively *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which held that once a suspect has asserted his right to counsel he cannot be questioned again unless he "initiates further communication, exchanges or conver-

sations with police"). When such a holding is made retroactive, in the criminal context, the rationale often is that the law or practice was void all along. *See, e.g., United States v. Johnson*, 457 U.S. 537, 550, 102 S.Ct. 2579, 2587, 73 L.Ed.2d 202 (1981) (citing *Moore v. Illinois*, 408 U.S. 786, 800, 92 S.Ct. 2562, 2570, 33 L.Ed.2d 706 (1972), and *Ashe v. Swenson*, 397 U.S. 436, 437 n. 1, 90 S.Ct. 1189, 1191 n. 1, 25 L.Ed.2d 469 (1970)).

Retroactive effect, on the other hand, generally has been denied to decisions in which a court reinterprets a criminal statute so as to narrow it, thus essentially repealing the statute as to some defendants. *See, e.g., Meyers v. Welch*, 179 F.2d 707 (4th Cir.1950), an opinion by Chief Judge Parker. The facts in *Meyers* are analogous to the facts on which this appeal is based. The prisoner in that case sought to set aside his perjury conviction through section 2255, relying on a construction of the perjury statute under which he was convicted in a case decided by the Supreme Court after the conviction had become final. In *Meyers*, this Court indicated that the later construction of the statute did not conflict with the construction forming the basis for Meyers' conviction. 179 F.2d at 708. Alternatively, we held that a prisoner could not be released through habeas proceedings on the basis of a Supreme Court decision conflicting with the construction of a criminal statute under which the prisoner had previously been convicted. *Id.* at 708.

The rationale for the decision in *Meyers* is that a conviction under a statute by which a court has jurisdiction at the time of the conviction is not rendered invalid because of later changes in the reading of the statute. As this Court acknowledged in *Meyers*, " 'We reject the idea that if a court was considered to have the power in 1939 to do a certain thing under existing statutory construction, and in 1941 that construction is changed so that it no longer has the power to do that thing, it should be concluded that it never had the power.' " 179 F.2d at 709 (quoting *Warring v. Colpoys*, 122 F.2d 642, 647 (D.C.Cir.), *cert.*

*denied*, 314 U.S. 678, 62 S.Ct. 184, 86 L.Ed. 543 (1941); *see also Meyers v. United States*, 181 F.2d 802 (D.C.Cir.), *cert. denied*, 339 U.S. 983, 70 S.Ct. 1030, 94 L.Ed. 1387 (1950) (adopting the views expressed in *Meyers v. Welch* for purposes of deciding an identical section 2255 motion brought by the same prisoner, on the same grounds, in the District Court for the District of Columbia). This reasoning is echoed in a line of cases beginning with the opinion of Judge, later Chief Justice, Vinson in *Warring v. Colpoys*, 122 F.2d 642 (D.C.Cir.), *cert. denied*, 314 U.S. 678, 62 S.Ct. 184, 86 L.Ed. 543 (1941). *See United States v. LaVallee*, 344 F.2d 313, 315 (2d Cir.), *cert. denied*, 382 U.S. 867, 86 S.Ct. 140, 15 L.Ed.2d 106 (1965); *Gaitan v. United States*, 295 F.2d 277, 280 (10th Cir.1961), *cert. denied*, 369 U.S. 857, 82 S.Ct. 939, 8 L.Ed.2d 15 (1962); *Wilson v. State of North Carolina*, 314 F.Supp. 249, 254 (E.D.N.C.1969), *appeal dismissed*, 429 F.2d 622 (4th Cir.1970); *Eby v. United States*, 286 F.Supp. 387 (N.D.Okla.1968), *aff'd*, 415 F.2d 319 (10th Cir.1969); *cf. Commonwealth ex rel. Almeida v. Rundle*, 409 Pa. 460, 187 A.2d 266, *cert. denied*, 374 U.S. 815, 83 S.Ct. 1709, 10 L.Ed.2d 1038 (1963) (Pennsylvania Supreme Court denied state habeas relief sought on the basis of a new theory of felony murder that could have removed petitioner's crime from that category, adopted after his conviction had become final).

The Supreme Court's decision in *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), however, casts doubt on the continued validity of this line of cases, including our decision in *Meyers*. *Davis* involved a conviction arising from the violation of Selective Service regulations. While the defendant's appeal was pending in the United States Court of Appeals for the Ninth Circuit, the Supreme Court decided *Gutnecht v. United States*, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970), a case interpreting the regulations under which Davis had been convicted.

The Ninth Circuit accordingly remanded Davis' case to the district court for reconsideration in light of *Gutnecht.* The district court, after conducting a hearing, decided that *Gutnecht* did not affect Davis' conviction. The Ninth Circuit affirmed. 447 F.2d 1376 (9th Cir.1971).

Davis had petitioned the Supreme Court for certiorari when the Ninth Circuit decided *United States v. Fox*, 454 F.2d 593 (9th Cir.1971). *Fox* reversed a conviction under the regulations interpreted in *Gutnecht* on facts, as the Supreme Court characterized them in *Davis*, "virtually identical to those in [Davis'] case." *Davis*, 417 U.S. at 339, 94 S.Ct. at 2301. The Supreme Court subsequently denied Davis' petition for certiorari, thus refusing to review the Ninth Circuit's 1971 decision affirming the district court's opinion that *Gutnecht* did not affect Davis' conviction. 405 U.S. 933, 92 S.Ct. 939, 30 L.Ed.2d 809 (1972).

Davis was remitted to federal custody to begin serving his three-year sentence after the Ninth Circuit denied his petition for rehearing. Subsequently, he moved under section 2255 to vacate his conviction, asserting as a basis for the motion the change in the law resulting from *Fox.* The district court denied the motion summarily, and the circuit court affirmed. 472 F.2d 596 (9th Cir.1972).

The Supreme Court reversed the Ninth Circuit, holding Davis' section 2255 motion to be cognizable. *See* 417 U.S. at 341–47, 94 S.Ct. at 2302–05. The court observed, as a matter of statutory construction, that section 2255 permits a prisoner "the right to be released upon the ground that the sentence was imposed in violation of the Constitution *or laws* of the United States." 417 U.S. at 345, 94 S.Ct. at 2304 (quoting section 2255, *see supra* note 1) (emphasis added by the Court). The Court then analyzed its prior decisions, observing that they had not removed the possibility that a section 2255 motion could be based on a nonconstitutional change in the law.[8]

---

8. The Court cited *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), and

*Kaufman v. United States*, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969), for the proposition

Thus, the Court concluded, Davis had met the "miscarriage of justice"/"exceptional circumstances" standard for nonconstitutional section 2255 motions because of the possibility that he had been convicted under an erroneous interpretation of the law. *Id.* at 346–47, 94 S.Ct. at 2305; *see infra* note 10.

We find it difficult to distinguish our decision in *Meyers* from that of the Supreme Court in *Davis,* although the effect of *Davis* is uncertain because the Court did not expressly address the line of cases that includes *Meyers.*[9] A possible difference does exist in the underlying rationale of each case. *Davis* relied on the language of section 2255, as well as inferences from earlier Supreme Court cases, to reach the conclusion that a section 2255 motion would not be defeated merely because it rested on nonconstitutional grounds. *See Davis,* 417 U.S. at 341–47, 94 S.Ct. at 2302–05. The decision in *Meyers* hinged on the power of a court to convict under a statute that is valid at the time of conviction, even though the statute is later given a narrowed construction. *See Meyers,* 179 F.2d at 709. The distinction nevertheless may be an unconvincing one because the very breadth of the decision in *Davis* implicitly rejects the holding in *Meyers,* whatever its

basis. *Davis* suggests that a change in law can serve as the basis for a section 2255 motion, whether the change is constitutional or nonconstitutional. Therefore, we must conclude that the line of cases including our decision in *Meyers* arguably has been overruled.[10]

## IV.

### EFFECT OF WILLIAMS ON BONNETTE'S CONVICTION

Assuming *arguendo* that *Davis* overruled *Meyers,* the Supreme Court's decision in *Williams* does not establish any error in Bonnette's convictions. The defendant in *Williams,* a bank president, had deposited several checks that were not supported by sufficient funds. By receiving immediate credit for these checks, he was temporarily able to cover a bad check from one bank by depositing it in a second bank and then writing a bad check from the second bank to the first. The misdoings ultimately were uncovered and the defendant was convicted of bank fraud under section 1014.

The Supreme Court reversed the conviction, basing its decision on a technical reading of section 1014. The section makes it a crime either to "knowingly make a false

that a change in the law can serve as the basis for a section 2255 motion. In his dissent, Justice Rehnquist distinguished the cases from the situation in *Davis. See Davis,* 417 U.S. at 362 & n. 18, 94 S.Ct. at 2312 & n. 18 (Rehnquist, J., dissenting) (observing that *Sanders* concerned the question whether a hearing is required on a claim admittedly cognizable under section 2255 and that *Kaufman* involved a constitutional ground for the section 2255 motion).

The majority in *Davis,* moreover, distinguished two cases in which collateral relief had been denied. It stated that *Sunal v. Large,* 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), stands "merely" as "an example of 'the general rule ... that the writ of *habeas corpus* will not be allowed to do service for an appeal.'" *Davis,* 417 U.S. at 345, 94 S.Ct. at 2304 (quoting *Sunal,* 332 U.S. at 178, 67 S.Ct. at 1590). The Court distinguished *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), as a case indicating that collateral relief is unavailable if the only ground for the relief is the failure to follow formal procedural requirements that do not cause prejudice to the defendant. *Davis,* 417 U.S. at 346, 94 S.Ct. at 2305. Justice Rehn-

quist criticized these distinctions as being overly narrow. *See Davis,* 417 U.S. at 362–63, 94 S.Ct. at 2312–13 (REHNQUIST, J., dissenting).

**9.** Although Justice Rehnquist's dissent also does not mention this line of cases, his reasoning supports the result in *Meyers.* He cogently argues that allowing nonconstitutional claims to be the basis of section 2255 motions upsets the orderly administration of justice. *See Davis,* 417 U.S. at 350–68, 94 S.Ct. at 2307–15 (Rehnquist, J., dissenting). Nevertheless, Justice Rehnquist is the only member of the Court to have dissented on this basis.

**10.** Given this conclusion, we also must assume that Bonnette has met the "miscarriage of justice"/"exceptional circumstances" standard necessary to justify a section 2255 motion based on nonconstitutional grounds. *See Davis,* 417 U.S. at 346, 94 S.Ct. at 2305 ("If this contention [that the change in law invalidates the conviction under old law] is well taken, then Davis' conviction and punishment are for an act that the law does not make criminal.").

statement" or to "willfully overvalu[e] any land, property or security...." *See supra* note 2. The Court held that Williams' conduct did not include a "false statement" because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Williams*, 458 U.S. at 284, 102 S.Ct. at 3091. Similarly, the Court concluded that Williams' acts did not represent the "overvalu[ing]" of property or a security. "Even assuming that petitioner's checks were property or a security as defined by § 1014, the value legally placed upon them was the value of petitioner's obligation.... In a literal sense, then, the face amount of the checks were their 'values.'" *Id.* at 285, 102 S.Ct. at 3092. In sum, the Court stated that to include Williams' conduct within section 1014 "would make a surprisingly broad range of unremarkable conduct a violation of federal law." *Id.* at 286, 102 S.Ct. at 3092.[11]

■ *Williams* does not affect Bonnette's convictions because his actions clearly are distinguishable from those of the defendant in *Williams*. Although checks may not be characterized as factual assertions and therefore cannot be false statements under section 1014, the sight drafts to which titles had been attached did represent assertions: that a car had been sold for the value indicated on the sight draft and, more basically, that a car in fact existed. The title-attached drafts were deposited in the Draft Acceptance Corporation account when, in reality, there either had been no sale or there was no car to sell. This represents, therefore, false statements un-

der section 1014.[12] *See Prushinowski v. United States*, 562 F.Supp. 151 (S.D.N.Y.), aff'd without opinion, 742 F.2d 1436 (2d Cir.1983) (denying motion to set aside section 1014 convictions because the obligations to the defendant's company reflected on the forged drafts were fictitious, not merely insufficient fund checks); *cf. United States v. Potts*, 540 F.2d 1278 (5th Cir.1976) (presentation to bank of false car title as security for a loan considered a false statement under section 1014).

Bonnette maintains, however, that this Court's decision in *United States v. Carlisle*, 693 F.2d 322 (4th Cir.1982), somehow modified or extended the Supreme Court's decision in *Williams*. The factual situation in *Carlisle* differed little from that in *Williams*. The defendant in *Carlisle* obtained two checks for which he knew there were insufficient funds and deposited them into his corporation's account. When the checks were returned, Carlisle covered the checks with more worthless checks. Although his actions may have been more enterprising than those of the defendant in *Williams*,[13] the actions constituted essentially the same conduct as that in *Williams* —the deposit of worthless checks.

■ Having held its decision in abeyance pending the outcome in *Williams*, this Court reversed Carlisle's conviction with minimal discussion: "In the *Williams* case, the Court ruled that § 1014 does not cover the depositing of a bad check at a federally insured bank, saying that the statute does not 'explicitly reach' the deposit of bad checks, and the legislative history does not demonstrate a congressional intent to make

---

**11.** The Court further observed that, "[u]nder the Court of Appeals' approach, the violation of § 1014 is not the *scheme* to pass a number of bad checks, it is the presentation of one false statement—that is, one check that at the moment of deposit is not supported by sufficient funds—to a federally insured bank." *Williams*, 458 U.S. at 286, 102 S.Ct. at 3092.

**12.** Furthermore, the evidence established that some of the title-attached drafts representing actual sales were overvalued.

**13.** As this Court described Carlisle's actions on the return of the checks,

In an effort to cover the worthless checks, Carlisle engaged in a system of check deposits, using six different business accounts, several wire transfers and a fraudulently obtained loan and a loan from Lee Bank and Trust Company which was never repaid by Carlisle. The scheme resulted in covering two checks by more worthless checks and extensions of credit until proceeds from two loans were deposited to cover the series of kited checks.

*Carlisle*, 693 F.2d at 324.

§ 1014 a 'national bad check law.'" 693 F.2d at 324. The chief difference between *Carlisle* and this case is, as suggested in the above discussion of *Williams*, that Bonnette's activities went beyond the mere depositing of bad checks. In this sense, he did not engage in a check-kiting scheme,[14] but rather in a scheme involving factual assertions about supposed car sales that either never occurred or involved less money than indicated on the title-attached drafts.

A recent decision of this Court supports a more limited interpretation of *Williams* than that urged by Bonnette. *See United States v. Price*, 763 F.2d 640 (4th Cir.1985). In *Price*, the defendant and his associates had opened a restaurant club in which members often paid their membership fees by credit card, the receipts of which were deposited at the restaurant club's bank. Price and his associates began manufacturing false credit card receipts, choosing names out of the telephone directory and fabricating both card numbers and amounts of sale. The defendant challenged his convictions under section 1014, arguing that the deposit of false credit receipts could no more be a false statement under section 1014 after *Williams* than the deposit of a bad check.

This Court in *Price* rejected the defendant's argument, observing that "there is nothing in *Williams* that equates the passing of checks drawn on accounts with insufficient funds with fraudulently making or altering a document." 763 F.2d at 643. Whereas the checks in *Williams* carried no representations about the drawer's account balance, the credit card receipts in *Price* "carried with them express false represen-

tations concerning the credit card account numbers, the account owners, and the amounts of purchase." *Id.* The title-attached drafts representing sales to Hornsby's Used Cars and to Capital City Chevron & Auto Sales are the functional equivalent of forged credit card receipts. These drafts reflected false representations concerning not only the amounts of purchase in car sales but also the existence of the sales. As in *Price*, we see nothing in *Williams* that equates such misrepresentations with the passing of checks drawn on accounts without sufficient funds.

## V.

## CONCLUSION

This appeal raises interesting questions about the scope of relief under section 2255 when the claim for relief is based on a nonconstitutional change in the law. The "cause" requirement stated in *Frady* arguably is not satisfied if the movant had a basis for making an objection at his trial and arguing the point on appeal. Even more troubling is the question whether the narrowed construction of section 1014 in *Williams* should be applied retroactively. The line of cases that includes our decision in *Meyers* suggests not, but the Supreme Court in *Davis* implicitly rejected this answer. Nevertheless, even assuming that *Williams* applies retroactively, that case does not affect Bonnette's convictions because Bonnette's acts went beyond mere depositing of checks. Accordingly, the order of the district court granting the government's motion for summary judgment is AFFIRMED.

AFFIRMED.

---

**14.** Bonnette argues that Judge Simons' instructions explaining check-kiting, occurring before the judge's instructions on the elements of a section 1014 violation, somehow "inferentially suggest[ed] that the kite is the essence of § 1014 [sic] violation." Brief of Appellant at 13. The argument, however, misses the point. Judge Simons' instructions explained the concept of check-kiting in order to clarify references to that term at trial. He then properly instructed the jury on the elements of a section 1014 violation, charging specifically that the title-attached

drafts were "securit[ies]" within the terms of that section and that they also represented "statement[s]" within that section. The judge did not instruct the jury that a draft, absent an attached title, could similarly be considered a security or a statement. *See supra* note 6. Consequently, we must conclude that, although check-kiting was explained, the jury was not led to consider the depositing of bad checks as the basis of the bank fraud counts for which Bonnette was charged and convicted.