46 F.3d 1127
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eli ELIASSI, a/k/a Eli Estari, a/k/a Eli Mohari, Defendant-Appellant.
 No. 94-5091.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 9, 1994.
Decided Feb. 1, 1995.
 
 ARGUED: Fred William DeVore, III, DEVORE & ACTON, P.A., Charlotte, NC, for Appellant. Brian Lee Whisler, Assistant United States Attorney, Charlotte, NC, for Appellee. ON BRIEF: Troy J. Stafford, DEVORE & ACTON, P.A., Charlotte, NC, for Appellant. Mark T. Calloway, United States Attorney, Charlotte, NC, for Appellee.
 Before RUSSELL and MOTZ, Circuit Judges, and LAY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant Eli Eliassi appeals his convictions and sentencing for charges of bank fraud under 18 U.S.C. Sec. 1344 and making false statements for the purpose of influencing a bank in violation of 18 U.S.C. Sec. 1014. We affirm.
 
 I.
 
 2
 In 1990, Defendant Eliassi, formerly Eli Mohari,[1] bought and rented low income property in the Charlotte, North Carolina, area. During the summer and early fall of 1990, he became romantically involved with Linda Kizer, whom he convinced to invest money in some real estate projects with him. Upon Kizer's recommendation, they sought financing from Crown National Bank, a new bank in Charlotte, to purchase additional properties.[2]
 
 
 3
 On November 29, 1990, Eliassi and Kizer received $297,975 in financing from the bank. Jim Garrett, the bank's president, testified that, based on oral representations by the borrowers, the bank lent them the money to purchase the Key Way apartment complex. The loan documents, however, stated that the purpose of the loan was to "Purchase rental producing properties." Joint Appendix (JA) at 439. The bank did not take a security interest in the Key Way property. For collateral, Kizer pledged a $67,000 certificate of deposit (CD) and Eliassi pledged fourth mortgages on seven properties in Charlotte (the "Jonquil Gardens properties"), which had been appraised at $442,000. Eliassi also submitted a one-page "Personal Financial Statement" to the bank stating that his net worth was $1,809,000. He included a list of "rent rolls" indicating that he owned approximately 300 rental properties, which he claimed generated a monthly income of approximately $33,000.
 
 
 4
 Kizer testified that after she spoke with a certified public accountant she became uncertain about her involvement in investments with Eliassi and asked to be taken off the Key Way loan and other investments. On December 5, 1990, she received a check for $99,000 from the loan proceeds and dissolved her business relationship with Eliassi. Eliassi replaced her CD with one of his own, plus another CD worth $50,000. The check to Kizer had been drawn on the account of Ken Parsons, a real estate attorney with whom the loan proceeds had been deposited in a trust account.
 
 
 5
 In January 1991, one day before the scheduled closing of the Key Way property, Parsons absconded from the Charlotte area. He eventually pleaded guilty to embezzling over $400,000 from his clients' funds and was permanently disbarred. The State Bar of North Carolina seized the trust account and began paying restitution to defrauded clients. Eliassi offered to assign whatever rights he had from the State Bar's Client Security Fund to the bank to offset its losses, but the bank did not attempt to collect from the fund.
 
 
 6
 As of April 1, 1991, Eliassi was three months late on his loan payments. Garrett had Eliassi's Jonquil Gardens properties reappraised and their fair market value had dropped to $177,000. On June 25, 1991, Eliassi received a demand letter notifying him that his loan was in default.
 
 
 7
 The bank subsequently turned the loan over to the FBI to investigate possible federal bank fraud violations. In late 1992, FBI Agent Jeffrey Showers interviewed Eliassi and asked him to identify, from the list he had provided to the bank, which of the 303 properties he actually owned. Eliassi identified only nine properties on the first six pages and then asked to stop. Agent Showers testified that Eliassi conceded that he managed many of the properties and that Judge William H. Helms and Larry Rupp actually owned many of the properties. Judge Helms testified that he owned 128 separate property units that appeared on the list and that he had hired Eliassi to manage them. Agent Showers also discovered that Eliassi could not identify where the monies from $100,000 worth of loan disbursements had gone and that the Key Way apartments contract never closed.
 
 
 8
 On June 9, 1993, a federal indictment charged Eliassi with attempting to defraud a federally-insured bank in violation of 18 U.S.C. Sec. 1344 and with making false statements to a bank in violation of 18 U.S.C. Sec. 1014. In November 1993, a jury convicted him on both counts. On January 25, 1994, the district court sentenced him to 18 months in prison on each count, to run concurrently, followed by five years of supervised release. The court also ordered Eliassi to make restitution to the FDIC, which had insured the bank's loss, in the amount of $193,212.07 and to pay a special assessment of $100.00.
 
 
 9
 On November 10, 1994, this Court denied Eliassi's pro se motions to dismiss his court-appointed counsel and to stay deportation proceedings pending appeal. This Court allowed Eliassi to file a pro se supplemental brief on November 30, 1994.[3]
 
 II.
 
 10
 Eliassi raises for the first time on appeal the issue of multiplicity, claiming that the indictment charged him with the same offense in both counts. He argues that the charges of attempting to defraud a federally-insured bank and of making a false statement to a bank impermissibly overlap. As the government points out, however, Eliassi has waived this claim by failing to raise it below before trial. United States v. Whittington, 26 F.3d 456, 466 (4th Cir.1994) (citing United States v. Price, 763 F.2d 640, 643 (4th Cir.1985)). Eliassi offers no showing of cause that would warrant relieving him of the consequences of this waiver.
 
 
 11
 Moreover, even if Eliassi could show cause, he does not qualify for relief because he did not receive multiple sentences. The proper remedy for a valid claim of multiplicity would be to vacate all the sentences but one. United States v. Burns, 990 F.2d 1426, 1438 (4th Cir.) (citing United States v. Ball, 470 U.S. 856, 864-65 (1985)), cert. denied, 113 S.Ct. 2949 (1993). Eliassi, however, did not receive multiple sentences that subjected him to multiple punishment. The district court correctly grouped the convictions for the two charges as arising from the same pattern of criminal conduct pursuant to U.S.S.G. Sec. 3D1.2 and imposed concurrent sentences. Therefore, in addition to our finding that Eliassi waived his multiplicity claim, we affirm his convictions because they did not result in multiple sentences for the same offense.
 
 III.
 
 12
 At the close of evidence, Eliassi moved for judgment of acquittal, see Fed.R.Crim.P. 29(a), claiming that the government failed to present sufficient evidence to support his convictions.[4] We review a denial of a motion for acquittal under the familiar sufficiency of the evidence standard, United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992), to determine "whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt," United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982) (citations omitted).
 
 
 13
 Eliassi argues that the government failed to establish that he made false representations of material facts to the bank, an essential element to both bank fraud under 18 U.S.C. Sec. 1344[5] and making false statements for the purpose of influencing a bank in violation of 18 U.S.C. Sec. 1014.[6] See United States v. Celesia, 945 F.2d 756, 758 (4th Cir.1991); United States v. Whaley, 786 F.2d 1229, 1231 (4th Cir.1986). In particular, Eliassi disputes the following allegations in the indictment: (1) the nature of the loan application he submitted to the bank; (2) the number of properties he owned when he applied for the loan; and (3) the value and rental income of those properties.[7] Because we find that the testimony of Agent Showers and Judge Helms constituted sufficient evidence to support Eliassi's convictions, these claims lack any merit.
 
 
 14
 First, Eliassi quibbles over terminology in the indictment stating that he had submitted a loan application to the bank. He contends that the bank did not require him to submit a formal application. The government argues that Garrett had assembled a file of documents pertaining to the loan including financial statements, a credit memorandum, a credit report, a commitment letter, a loan purpose form, a note, status reports, contracts, and other related documents such as Eliassi's rental property list. We find that the indictment adequately charges Eliassi with making false representations in loan documents he submitted to the bank.
 
 
 15
 Second, Eliassi contends that the government's own witnesses established that he owned many more than ten properties when he applied for the loan. His main defense is that the government, particularly Agent Showers, did not prove or attempt to verify the specific allegations in the indictment regarding Eliassi's property holdings. The district court, however, properly instructed the jury that the government need not prove all the details alleged in the indictment concerning the precise nature of the scheme to defraud the bank, but instead must prove that Eliassi "knowingly and willfully devised or intended to devise a scheme to defraud substantially the same as the one alleged in the indictment." See JA at 353. The testimony of Agent Showers and Judge Helms clearly provided sufficient evidence for a jury to infer that Eliassi did not own many of the properties that he had represented to the bank.
 
 
 16
 Finally, Eliassi challenges the government's use of the second appraisal of the Jonquil Garden properties he pledged as collateral for the loan to determine the value of properties he owned when he applied for the loan. He contends that because the bank had relied on an earlier, higher appraisal when making the loan, it could not claim fraud based upon the second appraisal. The government, however, asserts that the initial appraisal was not made in good faith, particularly because it was made subject to compliance with local code requirements and because evidence showed that Eliassi had bought the properties for only $170,000 four months before the loan.
 
 
 17
 Clearly the government need not prove every factual allegation in an indictment as long as it proves beyond a reasonable doubt each ele ment of the offense charged.[8] Although the bank may not have taken all the precautions that a prudent lender would have taken and the government may have overstated its case in the indictment, we conclude that the government presented sufficient evidence from which a rational jury could infer that Eliassi defrauded the bank by inflating the number of properties he owned outright. Therefore, we affirm the district court's denial of Eliassi's motion to acquit.
 
 IV.
 
 18
 Eliassi also disputes the district court's calculation of the loss sustained by the bank attributable to his loan. He claims that the government did not present any evidence as to how the loss was calculated and that the court did not take into account certain allowable deductions. The government counters by arguing that the court included all deductions mentioned by Eliassi except one, the money embezzled by Parsons, which the court properly included as loss. We review the district court's factual determinations regarding its calculation of the bank's loss for clear error. United States v. Rothberg, 954 F.2d 217, 219 (4th Cir.1992) (citing United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989)).
 
 
 19
 The Commentary to Sec. 2F1.1 of the Sentencing Guidelines instructs that in fraudulent loan application cases:
 
 
 20
 [T]he loss is the actual loss to the victim[or the expected loss]. For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan....
 
 
 21
 U.S.S.G. Sec. 2F1.1, comment. n. 7(b). The amount of the loss determines the increase in the defendant's base offense level and the resulting sentencing range. See U.S.S.G. Sec. 2F1.1.
 
 
 22
 The government calculates that from the original loan for approximately $297,000, the bank subtracted the two CDs pledged by Eliassi worth $117,000, leaving $180,000 due. The government points out that because the bank held only a fourth mortgage on the Jonquil Garden properties, the bank could not reasonably have expected to recover any appreciable amount from this collateral upon foreclosure.[9] The district court also considered three loan payments totalling approximately $41,100 that Eliassi and Kizer had made before his indictment, despite the government's protest that those payments would have mostly paid off interest. The court determined that the bank's loss was between $138,900 (deducting the pre-indictment payments) and $193,000 ($180,000 plus interest owed).
 
 
 23
 The court applied the Sentencing Guidelines and sentenced Eliassi within the 12 to 18 month range because the bank's loss was above $120,000 and below $200,000, which increased Eliassi's base offense level by 7 levels. U.S.S.G. Sec. 2F1.1. If the court had found that the bank had lost more than $70,000 and less than $120,000, then Eliassi's base level would have increased by only 6 levels and he would have been eligible for a split sentence in the 10 to 16 month range, which would not have required a prison term. Id .; see U.S.S.G. Sec. 5C1.1(c), (d).
 
 
 24
 Eliassi attempts to reduce the amount of the bank's loss to below $120,000 by deducting $12,000 that Parsons directly embezzled from Eliassi and $48,000 in Parsons' trust account that was unaccounted for but appeared to constitute proceeds from Eliassi's loan. Eliassi complains that it is unfair to charge him with these losses, which were not under his control, particularly because the bank never attempted to collect these sums from the State Bar's Client Security Fund. Upon de novo review of the district court's legal determinations for sentencing purposes, United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989), we conclude that the district court correctly denied the deduction.
 
 
 25
 In Rothberg, we held that assets other than collateral that a bank may recover "is akin to restitution and is not a proper consideration in determining the loss suffered as a result of the fraud." Rothberg, 954 F.2d at 219 (declining to deduct damages that could be recovered in a civil proceeding). In United States v. Wilson, 980 F.2d 259, 262 (4th Cir.1992), we held that payments by guarantors also should not be deducted from the loss because "[t]he defendant, through a third party, is returning that which he took." Furthermore, as the Seventh Circuit has noted, "[a] victim's failure to mitigate or the negligence of intervening actors does not prevent attributing to the defendants the full amount of the loss." United States v. Miller, 962 F.2d 739, 744 (7th Cir.1992) (citations omitted).
 
 
 26
 The district court correctly refused to deduct from the bank's loss the funds taken by Parsons. Eliassi defrauded the bank and should not receive a lower sentence merely because a third party embezzled the money Eliassi had obtained fraudulently. Any recovery by the bank from Parsons would be akin to restitution and should not reduce the amount of the bank's loss caused by Eliassi's misrepresentations. Therefore, we affirm Eliassi's sentence based upon the district court's calculation of the loss sustained by the bank.
 
 V.
 
 27
 For the foregoing reasons, we affirm Eliassi's conviction and sentencing.
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 "Eli Estari" also is named in the caption as an alias, but there was no evidence at trial that Eliassi ever used this name
 
 
 [2]
 The bank failed on May 7, 1993
 
 
 [3]
 Eliassi's pro se motions mostly stem from the government's omission of page 16 of its brief to this Court. We received the page shortly after the brief, but Eliassi claims that his attorney did not provide him with a copy of the missing page
 
 
 [4]
 In his pro se supplemental brief, Eliassi raises for the first time the claim that the indictment should have been dismissed at the close of the government's case because of the factual inaccuracies concerning his financial representations to the bank. We note that we construe indictments more liberally after verdict than before. Finn v. United States, 256 F.2d 304, 307 (4th Cir.1958), cited in United States v. Darby, 37 F.3d 1059, 1063 (4th Cir.1994). Furthermore, because Eliassi challenges the factual content of the indictment, not the adequacy of the elements charged, our finding of sufficient evidence for his convictions also disposes of this issue
 
 
 [5]
 18 U.S.C. Sec. 1344 provides that:
 Whoever knowingly executes, or attempts to execute, a scheme or artifice--
 (1) to defraud a financial institution; or
 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned for not more than 30 years, or both.
 
 
 [6]
 18 U.S.C. Sec. 1014 provides that:
 Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the [FDIC] ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
 
 
 [7]
 The indictment alleged in Count One that Eliassi submitted to the bank:
 a loan application in which he misrepresented his net worth, number of real estate holdings, and the appraised value of such holdings, by declaring a net worth of $1,809,000, ownership of 303 rental properties valued at $2,805,000, providing an approximate net monthly income of $33,000, when in truth and in fact, at the time of application, he owned no more than 10 properties, appraised at no more than $177,000, generating approximately $3,000 in net monthly income.
 JA at 8. Count Two repeated the factual allegations and charged that Eliassi "made false statements," without referring to a loan application. JA at 9.
 
 
 [8]
 We note that Eliassi has failed to demonstrate that any variance caused by evidence at trial establishing facts materially different from those alleged in the indictment infringed his substantial rights and thereby resulted in actual prejudice. See United States v. Kennedy, 32 F.3d 876, 883 (4th Cir.), petition for cert. filed, --- U.S.L.W. --- (Oct. 18, 1994) (No. 94-6500); see also United States v. Brewer, 1 F.3d 1430, 1437 (4th Cir.1993) (noting prejudicial error only when indictment precludes adequate notice to prepare a defense or fails to describe crime with sufficient particularity to protect defendants from multiple prosecutions for the same offense)
 
 
 [9]
 At the sentencing hearing the U.S. Attorney informed the district court that the bank had initiated foreclosure proceedings on the collateral, but did not expect to receive any of the proceeds because of its fourth position. Eliassi's attorney subsequently informed this Court that the bank did not receive any money from the foreclosure