**Derrick Anthony PRICE, Petitioner,**

**v.**

**UNITED STATES of America, Respondent.**

**Criminal Action No. 2:92cr196.**

United States District Court, E.D. Virginia, Norfolk Division.

March 7, 1997.

---

Derrick Anthony Price, Atlanta, GA, Pro Se.

Ronald G. Reel, Special Asst. U.S. Attorney, U.S. Attorney's Office, Norfolk, VA, for United States of America.

## ORDER AND OPINION

DOUMAR, District Judge.

This matter is before the Court on the *pro se* motion of Derrick Price under 28 U.S.C. § 2255 to correct, vacate, or set aside his sentence. Pursuant to a plea agreement, Price pled guilty to using a firearm in relation to a drug trafficking offense, in violation 18 U.S.C. § 924(c). Price argues that his conviction is nevertheless invalid under *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), because no evidence established that he "used" a firearm. Because this Court holds that Bailey should not be applied retroactively to cases on collateral review, the motion is denied,

### I. Background

### A. Factual and Procedural Background

On May 8, 1992, Price drove to a house where police were executing a search warrant. Unaware of the search in progress, Price entered the house and consented to a patdown search. A police officer discovered on Price's person a bag containing about thirty grams of crack cocaine. The officer told Price that he was under arrest. A distraction gave Price the opportunity to escape, and he fled the house. Although an officer pursued him, Price was not apprehended. Police then searched the car in which Price arrived and found identification, what appeared to be a ledger of drug sales and customer accounts, and 3.26 grams of crack cocaine. The City of Norfolk Police Department subsequently issued a warrant for his arrest and charged Price with possession of cocaine with intent to distribute, sale of cocaine, and escape without force.

On July 10, 1992, police officers spotted a car registered to Price, who was still wanted in connection with the May 8 events. The police stopped the vehicle. Two other people were in the front seat; Price was the only passenger in the back seat. Next to Price on the car's backseat was a gun bag, which held a nine-millimeter handgun, two loaded magazines of ammunition, fifty nine-millimeter bullets, and a medicine bottle containing 6.6 grams of crack cocaine.

In November 1992, a grand jury charged Price with a seven-count indictment. Counts One, Two, and Four charged that the defendant did knowingly and unlawfully distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). Each count alleged distribution on different dates. Count Three charged Price with an attempt to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 846. Count Five charged Price with possession with intent to distribute cocaine base on May 8, 1992, in violation of 21 U.S.C. § 841(a)(1). Count Six also charged Price with possession with intent to distribute cocaine base on July 10, 1992. Count Seven charged the use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).[1] The drug

---

1. The statute under which Price was charged states that:

    Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence of a drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

    18 U.S.C. § 924(c)(1). The statute thus criminalizes both "using" and "carrying" a gun during and in relation to a drug trafficking crime. *See* 18 U.S.C. § 924(c). The indictment did not allege that Price "carried" the gun, only that he "used" the gun. Count Seven of the indictment reads, "[o]n or about July 10, 1992, at Norfolk, Virginia, within the Eastern District of Virginia, the defendant herein, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, used a firearm to wit: Model TEC–9, .9[sic] mm pistol, Serial Number 23918."

    The plea agreement Price later entered into described his criminal conduct as "possession of a firearm while in possession of a controlled substance." The plea agreement did state correctly that the mandatory penalty for the charged offense was five years, and Price agreed to serve that term.

trafficking crime referenced was the charge in Count Six of possession with intent to distribute cocaine base on July 10, 1992. Price now challenges his conviction under Count Seven.

Pursuant to a plea agreement, Price pled guilty to the charges in Counts Five and Seven. In accordance with the plea agreement, the five other counts were dropped.

At Price's guilty plea hearing, the Court conducted a thorough colloquy to ensure that Price's guilty plea was knowing and voluntary. The undersigned was convinced that Price's plea met that standard under the law as the Fourth Circuit interpreted it at that time. On April 28, 1993, Price was sentenced to 97 months imprisonment on Count Five and 60 months consecutive imprisonment on Count Seven. He did not directly appeal his conviction. Price later filed this motion to vacate, set aside or correct his sentence.

### B. The Bailey Decision

Price was convicted and sentenced prior the Supreme Court's ruling in the case of *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Prior to the decision in *Bailey v. United States,* courts had generally interpreted the term "use" broadly and almost synonymously with "possession" and "carry." Under pre-*Bailey* law, Price's guilty plea and conviction conformed with 18 U.S.C. § 924(c).

The *Bailey* Court, however, more narrowly construed the statutory term "use" and required that a defendant "actively employ" a firearm, by means such as brandishing, displaying, bartering, firing, or attempting to fire the firearm in order to be guilty of "using" the firearm in violation of 18 U.S.C. § 924(c). *Id.* at ——, 116 S.Ct. at 508. Using a firearm to strike another or referring to the firearm during a transaction also could support a conviction under the "use" prong of 18 U.S.C. § 924(c). *Id.* According to *Bailey* "use" does not include the mere possession

or storage of a firearm for protection at or near the site of a drug crime or its proceeds. *Id.* The Court explained that a person can use a firearm without carrying it and can carry a firearm without using it. *Id.* at ——, 116 S.Ct. at 507. *Bailey* did not alter the prevailing definitions of "carry."

### C. Subsequent Applications of Bailey

Many defendants were sentenced under 18 U.S.C. § 924(c) for actions which would no longer be considered criminal under *Bailey*'s definition of "use," causing courts to vacate sentences or reverse these convictions. *See e.g. United States v. Miller,* 84 F.3d 1244 (10th Cir.1996). Reversals have been common in jury trials when it cannot be ascertained whether the jury found that the defendant was "using" the firearm, or whether it found that the defendant was "carrying" the firearm. *See, e.g., United States v. Smith,* 94 F.3d 122 (4th Cir.1996). Fewer cases have addressed the impact of Bailey upon cases in which the defendant pled guilty and later challenged his conviction on collateral review.

In this case, Price argues that his conviction under 18 U.S.C. § 924(c)(1) ought to be set aside because no evidence established that he used a firearm. The Government argues that his conviction should be upheld because a guilty plea waives a defendant's right to challenge the factual basis of the crime. Price's challenge is not, however, a challenge to the factual basis for his plea. He does not now deny the conduct to which he admitted, or attempt to alter the facts underlying his conviction. Instead, he claims that the conduct that he admitted is no longer defined as a criminal "use" of a firearm under Section 924.

Clearly, under the law as is now understood after *Bailey,* Price did not "use" the firearm on the facts before this Court. But Price did "carry" the firearm; he knowingly transported the gun with drugs in a portable gun bag placed next to him in a vehicle. *See United States v. Mitchell,* 104 F.3d 649, 653

---

At the time of Price's indictment, no one would have characterized the failure of the indictment to charge Price with "carrying" a weapon as an error. Before *Bailey,* the term "using" was understood widely to be co-extensive, if not functionally synonymous, with the term "carrying." If the government could have foreseen the Su-

preme Court's decision in *Bailey,* it undoubtedly would have charged Price with "carrying" the firearm. If the indictment had charged Price with "carrying" a firearm, his guilty plea and ensuing conviction could not be challenged on collateral review because the evidence established that he did carry a firearm.

(4th Cir.1997) (holding that the term "carry" requires "knowing possession and bearing, movement, conveyance or transportation of the firearm"); *United States v. Willett,* 90 F.3d 404, 407 (9th Cir.1996) (holding that the defendant "was 'carrying' a gun because he transported it 'within reach and immediately available for use.'"); *United States v. Rias-cos–Suarez,* 73 F.3d 616, 623 (6th Cir.1996) (transportation of a firearm in a vehicle within reach could be sufficient factually to support a guilty plea for "carrying"); *United States v. Crawford,* 932 F.Supp. 748, 752 (E.D.Va.1996) ("When a drug crime is facilitated by the use of a vehicle, the vehicle itself becomes the means of carrying the weapon."). Thus, Price seeks to vacate his conviction for "using" a firearm, even though he did, in fact, violate the statute under which he was charged.[2]

## II. Analysis of Bailey's Applicability to Cases on Collateral Review

■ Pursuant to 28 U.S.C. § 2255, the statute upon which petitioner relies,

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Thus, the question in this case is whether Price was sentenced in violation of the Constitution or laws of the United States. Price pled guilty to a criminal offense. At the time, his plea conformed to the then-existing state of the law. Subsequent to Price's guilty plea, the Supreme Court in *Bailey* then altered the prevailing judicial interpretations of 18 U.S.C. § 924(c). Thus, this Court must determine whether the new rule of law as set forth in *Bailey* should be applied retroactively on collateral review, long after defendant's conviction became final.

In *Bailey,* the Supreme Court considered two cases on direct appeal, and the Court expressly indicated that its decision must be retroactively applied on direct review. Several district courts, including courts in this district, have found *Bailey* retroactive on collateral review also. *See e.g.; United States v. Forrest,* 934 F.Supp. 731 (E.D.Va. 1996); *Crawford,* 932 F.Supp. 748; *Abreu v. United States,* 911 F.Supp. 203 (E.D.Va. 1996); *United States v. Cota–Loaiza,* 936 F.Supp. 751 (D.Colo.1996) (citing other cases holding *Bailey* retroactive). Only one Circuit Court of Appeals, however, has squarely addressed the issue and found *Bailey* retroactive on collateral review.[3] *See United States v. Barnhardt,* 93 F.3d 706 (10th Cir. 1996). In contrast, the Court of Appeals for the Eighth Circuit refused to apply Bailey retroactively on collateral review, reasoning that such claims are procedurally defaulted if not raised on direct review. *See Bousley v. Brooks,* 97 F.3d 284, 288 (8th Cir.1996). Several other Circuits have refused to certify that successive petitions for collateral relief based upon *Bailey* present a retroactive constitutional issue that would permit the filing of a successive petition, which indicates some skepticism about *Bailey*'s retroactivity. *See United States v. Lorentsen,* 106 F.3d 278 (9th Cir.1997); *Nunez v. United States,* 96 F.3d 990 (7th Cir.1996); *Hohn v. United States,* 99 F.3d 892 (8th Cir.1996); *In re Blackshire* 98 F.3d 1293 (11th Cir.1996).[4]

---

2. Of course, after *Bailey,* the government would have charged that Price "carried" the firearm. This Court has no doubt that if Price were charged today with "carrying" a firearm, the same reasons that led him to plead guilty then would cause him to plead guilty now.

3. The Sixth Circuit has held Bailey retroactive on collateral review in numerous unpublished cases, but not in a published one. *See, e.g,. Jenkins v. United States,* No. 95–1809, 1996 WL 683603 at *2 (6th Cir. Nov. 22, 1996).

4. The recent amendments to habeas laws, The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (the "AEDPA"), restrict the availability of collateral review when a petitioner has previously challenged his conviction on collateral review. In order for a second or successive petition to be heard, a Court of Appeals must certify that the petition qualifies for review by meeting certain conditions, one of which is that the petition is based upon a new rule of constitutional law made retroactive by the Supreme Court. If Price

## A. Supreme Court Precedents

The courts finding *Bailey* retroactive on collateral review often have relied upon a Supreme Court case predating *Bailey*, *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). Davis was convicted of failing to report for draft induction. A Court of Appeals decision issued after Davis's conviction stated that the regulations at issue had been interpreted erroneously. Based on its interpretation of the regulation, the Court of Appeals held that draftees ordered to report under the procedures that were used for Davis had been illegally ordered to report, and that such individuals could not be convicted of failing to report. When Davis challenged his conviction pursuant to § 2255, the Supreme Court held that he had stated a cognizable § 2255 claim based upon the subsequent reinterpretation of the statutory law. Most courts have construed *Davis* as requiring that a substantive change in the law must be applied retroactively, and have considered *Davis* the final word on retroactivity of statutory changes.

The Supreme Court, however, changed the legal landscape of retroactivity on collateral review when it issued the seminal opinion in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Teague was convicted after a prosecutor admittedly used all ten of his peremptory challenges to strike black panel members from the jury pool. The Supreme Court subsequently decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which held that striking jurors based on their race violated the Constitution. Teague then challenged his conviction collaterally, requiring the Supreme Court to decide whether *Batson*'s holding could be used to vacate the convictions of defendants entered before the *Batson* case was decided. The Court used *Teague* as a vehicle for announcing a new restrictive view of collateral relief.

The Court held that new rules generally should not apply retroactively to cases on collateral review unless the new rule qualifies under two narrow exceptions. Retroactivity should be denied unless the new rule 1) places primary, private conduct beyond the power of the law-making authority to prescribe, or 2) relates to a bedrock procedural element without which the likelihood of an accurate conviction is seriously diminished. *Teague*, 489 U.S. at 311–15, 109 S.Ct. at 1075–78. The Court broadly defined the new rule concept, explaining that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States of the Federal Government. To put it another way, a case announces a new rule if the result was not *dictated* by precedent existing at the time defendant's conviction became final." *Id.* at 301, 109 S.Ct. at 1070 (citations omitted).

*Teague* was premised upon the importance of finality in criminal judgments.[5] *See Gilmore v. Taylor*, 508 U.S. 333, 340, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993) (noting that *Teague* "validates reasonable good faith

had filed a previous § 2255 action, he probably would not be allowed to challenge his conviction in this motion. The cases just cited have held such a petition successive, and not based on a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." Accordingly, if the Court of Appeals for the Fourth Circuit were to agree, it would refuse to certify the petition to allow the claim to be heard, and petitioner's claims under *Bailey* would not even be considered.

5. Interestingly, Congress also recently indicated the high value it places upon finality in criminal judgments. As discussed previously in footnote four, recent amendments to laws controlling collateral challenge procedure would prevent Price from making this challenge if he previously sought collateral relief. This led one court considering a *Bailey* challenge to conclude that "[b]y

limiting relief to developments of constitutional magnitude, the [AEDPA] changes the outcome of *Davis v. United States*, for successive § 2255 petitions (although not for initial ones)." *Nunez v. United States*, 96 F.3d 990 (7th Cir.1996).

Congress clearly intended that not all prisoners affected by statutory reinterpretations would be allowed to seek collateral relief By enacting the AEDPA, Congress encouraged finality in criminal convictions, and it sought to reduce the amount of claims being litigated on collateral review. *See Clarke v. United States*, 955 F.Supp. 593 (E.D.Va.1997). Congress thus followed the Supreme Court's lead in *Teague* and circumscribed the availability of collateral review. Congress's recent enactment of the AEDPA demonstrates that the proper focus should be the nature and propriety of habeas relied not the underlying arguments that a petitioner asserts.

interpretations of existing precedents made by state courts and thus effectuates the States' interests in the finality of criminal convictions and fosters comity between federal and state courts.") (citations omitted). The Court explained that collateral challenges "delay the enforcement of the judgment at issue and decrease the possibility that there will at some point be certainty that comes with an end to litigation." *Teague*, 489 U.S. at 314 n. 2, 109 S.Ct. at 1075 n. 2 (internal quotations omitted).

The *Teague* opinion was based upon Justice Harlan's opinion in a prior case, *Mackey v. United States*, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part and dissenting in part). Harlan's *Mackey* opinion supports limiting the availability of the writ of habeas corpus generally and stresses the importance of respecting the finality of judgments entered in accordance with the law at the time. Harlan argued that "it is sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of [habeas] cases on the basis of intervening changes in constitutional interpretation." *Id.* at 688, 91 S.Ct. at 1178.

The Court in *Teague* nowhere indicated that this important observation applied only to new rules of procedure and not to . new interpretations of substantive law. Because *Teague* arose in the context of a so-called procedural constitutional rule, some have concluded that *Teague* is limited to only procedural constitutional rules, and that the *Davis* case continues to control cases involving substantive changes in statutory law.[6] Analytically, then, the key questions to be answered are: what scope did the Supreme Court intend for *Teague*, and whether *Teague* abrogated *Davis*. In other words, does *Davis* survive *Teague* ?[7] Neither the Court of Appeals for the Fourth Circuit, nor the Supreme Court itself has offered lower courts any clear guidance on this issue, and no higher precedent guides this Court.[8]

### B. *Teague* Controls *Bailey*

This Court holds that *Bailey* should not be applied retroactively on collateral review. This Court does recognize that most courts have reached the opposite conclusion. Yet, the reasons for collateral review and the policy that guided the Supreme Court in *Teague* often have been overlooked. As Justice Harlan explained in the case upon which *Teague* relied, "[t]he relevant frame of refer-

6. Because many courts have struggled to pigeonhole cases into the appropriate category, such as a "non-constitutional substantive new rule" or a "constitutionally-required procedural rule based on the guarantees of substantive due process," thoughtful retroactivity analysis often has been stymied. This Court finds the attempts to slot cases into rigid topical categories arbitrary and often misleading. Cf. *United States v. Woods*, 986 F.2d 669, 677 (3d Cir.1993) (noting that the circumstances of the case did not fit "neatly" within either the procedural or substantive category and fashioning an intermediate standard).

7. Even if *Davis* did, in fact, survive *Teague* and controls substantive statutory changes, this Court is not convinced that the *Davis* rationale would apply in this case. *Davis* did not arise in a plea agreement context. *Davis* was convicted after a trial. *Davis*, 417 U.S. at 333, 94 S.Ct. at 2300. Unlike Price, Davis was charged only with the one count challenged, and Davis did not benefit from a plea agreement that allowed other pending counts to be dropped. The Court noted that a subsequent case should be applied retroactively to Davis because "[t]here can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'presents exceptional circumstances' that justify

collateral relief under § 2255." *Id.* at 346–47, 94 S.Ct. at 2305.

This Court does not find that Price's case presents such exceptional circumstances, or that to uphold Price's conviction would amount to a miscarriage of justice. Any "error" made in his case did not "result[ ] in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) (discussing the standards for procedural default of claims on collateral review). To the contrary, justice would be frustrated if Price's conviction was vacated, for he would retain the substantial benefits of his plea bargain while shirking his responsibilities under the plea agreement because of a technical oversight in the indictment.

8. This Court is aware of a recent Fourth Circuit case allowing defendants whose sentences were vacated after a successful § 2255 challenge based upon *Bailey* to be resentenced. *United States v. Hillary*, 106 F.3d 1170 (4th Cir.1997). That appeal was limited only to the issue of whether a defendant could be resentenced after a conviction had been vacated. Retroactivity was not analyzed, possibly because the case was considered on expedited review.

ence, in other words, is not the purpose of the new rule whose benefit petitioner seeks, but instead the purposes for which the writ of habeas corpus is made available." *Mackey,* 401 U.S. at 682, 91 S.Ct. at 1175. To focus unduly on the *Bailey* decision without giving fill attention to the purposes of collateral review is to lose the forest in all the trees.

■ After *Teague,* the Court of Appeals for the Fourth Circuit has not addressed whether changes in substantive statutory law should be applied retroactively.[9] A close reading of *Teague* and an examination of its reasoning demonstrate that *Teague* should have a broader, more expansive application than it is usually afforded. *Teague* greatly restricted the availability of collateral relief, and it is applicable even in death penalty cases. *Penry v. Lynaugh* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding *Teague* applies to capital cases); *see also Sawyer v. Smith,* 497 U.S. 227, 228, 110 S.Ct. 2822, 2824, 111 L.Ed.2d 193 (1990) (rejecting the argument that "new rules of capital sentencing that preserve the accuracy and fairness of capital sentencing judgments" should be retroactively applied). This Court sees no reason why changes in statutory interpretation should be more readily applied retroactively than changes required by the Constitu-

tion, such as the *Batson* decision, especially when the violations of the Constitution have occurred in a capital case. Instead, "we should expect that, given the relative importance of new constitutionally-dictated rules of procedure, our rules of retroactivity would, if anything, require that courts apply new rules of constitutional law with more liberal retroactivity than they would of non-constitutional law." *Sanabria v. United States,* 916 F.Supp. 106, 111 (D.P.R.1996).

Significantly, the Supreme Court did not place the *Bailey* decision on a constitutional footing. Courts' prior interpretations of § 924's "use" requirement were not unconstitutional, but merely were misinterpretations of Congress's intent. If Congress had itself clarified 18 U.S.C. § 924(c) by requiring active employment of the firearm (reaching exactly the same result as the *Bailey* opinion), the amendment would be presumed non-retroactive unless Congress clearly and expressly indicated contrary intent. *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 311–12, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274(1994). This Court sees no reason to reach a startlingly different result when Congress amends a statute than when the Court judicially interprets a statute differently than the majority of previous lower court interpretations.[10]

9. The Fourth Circuit did consider such claims before *Teague* but after *Davis. See United States v. Bonnette,* 781 F.2d 357 (4th Cir.1986) (concluding that a reinterpretation in a mail fraud statute should be applied retroactively); *see also United States v. Mandel,* 862 F.2d 1067, 1074–75 (4th Cir.1988) (holding same for writ of error coram nobis).

*Bonnette* certainly does not resoundingly support the proposition of law often ascribed to it. *See e.g., Abreu v. United States,* 911 F.Supp. 203, 207 (E.D.Va.1996); *United States v. Tayman,* 885 F.Supp. 832, 840 (E.D.Va.1995). The *Bonnette* Court showed great reluctance to overturn its prior line of cases which had held "that a prisoner could not be released through habeas proceedings on the basis of a Supreme Court decision conflicting with the construction of a criminal statute under which the prisoner had previously been convicted." *Id.* at 362 (citing *Meyers v. Welch,* 179 F.2d 707, 708 (4th Cir.1950)). The *Bonnette* Court observed that the "line of cases including our decision in *Meyers* arguably has been overruled" by *Davis. Id.* at 364. *Bonnette* concluded, "even assuming that [the case at issue] applies retroactively," that the particular

defendant's actions were still illegal, even under the new law. *Id.* at 366.

Thus, the *Bonnette* case cannot fairly be characterized as a triumphant embracing of *Davis* 's reasoning. Given the Fourth Circuit's prior reluctance to subscribe to the reasoning of *Davis* this Court finds it most likely that the Fourth Circuit would conclude that its prior line of cases was "resurrected" by *Teague* and that the Supreme Court intended to curtail the availability of habeas corpus actions in all circumstances but *Teague* 's two specific exceptions.

10. When the Supreme Court interprets statutes differently than lower courts have, doctrinally the court does not change or amend the statute, but merely indicates what the statute has always meant. *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 311–12, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274 (1994) ("A judicial construction is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."). The practical result of a higher court's reinterpretation is to change the law, however. It is surely a semantic dance to regard new requirements de-

Adopting Justice Harlan's views, the *Teague* Court stressed the value of finality in criminal adjudications, recognizing that a liberal rule of criminal retroactivity would "*continually* force[ ] the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." *Teague*, 489 U.S. at 310, 109 S.Ct. at 1075. Justice Harlan's poignant observation resonates particularly well in *Bailey* cases, given the volume of petitioners who have already challenged their convictions under *Bailey*.

Later Supreme Court cases have affirmed the central wisdom of *Teague*. For example, in *Gilmore v. Taylor*, 508 U.S. 333, 339–40, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993), the Court stated, "[s]ubject to two narrow exceptions, a case that is decided after a defendant's conviction and sentence became final may not provide a basis for federal habeas relief if it announces a 'new rule.' " The Supreme Court also broadly described the purpose of *Teague* later, stating:

> The principle announced in *Teague* serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered. This is but a recognition that the purpose of federal habeas corpus is to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine.

*Sawyer*, 497 U.S. at 234, 110 S.Ct. at 2827 (quoted in *Turner v. Williams*, 35 F.3d 872, 878–79 (4th Cir.1994)).

Therefore, *Teague* applies to new rules of substantive statutory law and controls this case.

### C. Teague's Exceptions Do Not Apply to this Case

*Teague* stated that new rules should not apply retroactively unless one of two exceptions is met. The first exception pertains to new rules that "place an entire category of primary conduct beyond the reach of the

criminal law or new rules that prohibit imposition of a certain type of punishment for a class of defendants because of their status or offense." *Sawyer v. Smith*, 497 U.S. 227, 241, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990) (citations omitted). The first exception is about Congress's power to regulate substance—the areas of life upon which the legislature may not permissibly impinge, such as forbidding the sale of contraceptives. If *Teague* only applies to so-called "procedural" issues, the first exception is effectively rendered superfluous. To narrowly confine *Teague* to the realm of rote, mechanical procedure is to eviscerate it.

In accord, Fourth Circuit precedent has indicated a narrow, literal view of *Teague*'s first exception. *See Bassette v. Thompson*, 915 F.2d 932, 939 (4th Cir.1990) (giving examples such as a state forbidding the sale of contraceptives or forbidding interracial marriages as individual conduct beyond the power of laws to regulate); *see also Williams v. Dixon*, 961 F.2d 448, 453–54 (4th Cir.1992) (finding Teague's first exception inapplicable to the case because the conduct proscribed was capital murder, which obviously may be prosecuted). *Teague*'s first exception does not automatically apply if a particular defendant would have a different outcome under the new rule. Instead, *Teague* asks only whether certain conduct is placed beyond the authority of the law to proscribe.

Congress certainly is not constitutionally prohibited from enacting a law criminalizing the using, carrying, or possessing of a firearm in relation to a drug trafficking crime. In *Bailey*, the Supreme Court merely said that some courts' interpretations of 18 U.S.C. § 924(c) were wrong. Bailey did not indicate that Congress lacked the authority to make a broader law. In fact, the opinion expressly noted that Congress retained the power to proscribe broader conduct. *See Bailey*, —— U.S. at ——, 116 S.Ct. at 508 ("If Congress had intended to deprive 'use' of its active connotations, it could have simply substituted a more appropriate term—'possession'—to cover the conduct it wished to reach."). Accordingly, the first *Teague* exception is inapplicable to this case.

rived from the Constitution as "new," but deny

that new interpretations of statutes are "new."

The second *Teague* exception applies to new rules which are "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 1264, 108 L.Ed.2d 415 (1990), and which "'alter our understanding of the *bedrock procedural elements*' essential to the fairness of a proceeding." *Sawyer*, 497 U.S. at 242, 110 S.Ct. at 2831. This is a narrow exception, which has only been applied to a handful of new rules with "primacy and centrality," such as the right to counsel. *See Saffle*, 494 U.S. at 495, 110 S.Ct. at 1264. The Court further noted that most of these exceptions have already been discovered, and that most new rules would be unlikely to fall under this exception. *Sawyer*, 497 U.S. at 243, 110 S.Ct. at 2832. The clarification of the law in *Bailey* certainly is not a clarification of a bedrock fundamental procedure, and it does not fall under *Teague*'s second exception.

Accordingly, this Court finds that the *Bailey* decision does not fall under either of *Teague*'s exceptions allowing retroactive application. Thus, the *Bailey* decision should not be applied retroactively on collateral review.

### III. Conclusion

This Court recognizes that this conclusion may be an unpopular one. Yet, it remains convinced that such a ruling is faithful to precedent. As Justice Harlan explained:

> At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it

must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not. the judicial system, not society as a whole is benefitted by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.

*Mackey*, 401 U.S. at 690–91, 91 S.Ct. at 1179 (Harlan, J., concurring in part, dissenting in part).

Not only is the result in this case doctrinally justified, it is pragmatic and fair. Price plead guilty. He admitted violating 18 U.S.C. § 924(c) in order to avoid the possibility of sentences on other counts. If this Court were simply to vacate Price's conviction, Price would receive a windfall.[11] He would maintain the benefits of his plea bargain and remain unpunished for his violation of 18 U.S.C. § 924(c). Vacating the Section 924 conviction would free Price from serving the term he agreed to serve in return for the Government dropping five counts of the indictment. Such a result would clearly violate both the Government's and Price's expectations of the effect of the guilty plea contract.[12] If a defendant may plead guilty to an offense while maintaining his innocence, *see North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), then surely a defendant's plea of guilty may withstand collateral challenge based upon a subsequent clarification of the law when the defendant is

---

11. The Court of Appeals for the Eighth Circuit voiced similar concerns. *See Bousley*, 97 F.3d at 288 (rejecting petitioner's argument that *Davis* controlled on the grounds that "*Davis* involved a conviction after a. trial and a direct appeal in which the petitioner presented the same issue in his later section 2255 action. This is a far cry from a collateral attack of a conviction resulting from a plea agreement.").

12. The Court notes that defendants charged with multiple counts, which include a count of violating 18 U.S.C. § 924(c), often opt to plead guilty to that charge because the punishment is a

known quantity. Defendants know that they will be sentenced to 60 consecutive months if they plead guilty to violating § 924(c). If defendants were to plead guilty to drug counts instead, they could not accurately predict their sentence until a presentence report was prepared under the sentencing guidelines. Thus, many criminal defendants have already received a substantial benefit in being allowed to plead guilty to violating 18 U.S.C. § 924(c). This Court refuses to confer additional benefits by vacating the convictions that defendants bargained for to avoid greater sentences.

guilty of the offense charged. This Court is not willing to bestow a windfall upon Price, who pled guilty to the statute that he did, in fact, violate.

Accordingly, Price's motion to vacate, set aside or correct his sentence is DENIED. The Clerk of the Court is directed to send copies of this order to the petitioner and to counsel for the United States. Petitioner is ADVISED that he may appeal in forma pauperis from this Final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia, 23510. Said written notice must be received by the Clerk within sixty (60) days of the date of this Order. The Clerk is REQUESTED to send a copy of this Final Order to Petitioner and to the United States Attorney.

IT IS SO ORDERED.