Patricia Furlong **ELLIOTT,**
Defendant–Appellant,

v.

**UNITED STATES of America,**
Plaintiff–Appellee.

**United States of America,**
Plaintiff–Appellant,

v.

**Patricia Furlong Elliott,**
Defendant–Appellee.

Nos. 02–4755, 02–4836.

United States Court of Appeals,
Fourth Circuit.

Argued: April 4, 2003.

Decided: June 18, 2003.

---

754

**ARGUED:** John Henry Herbig, Parker, Pollard & Brown, P.C., Richmond, Virginia, for Appellant. Thomas Andrew Hanusik, Trial Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Stephen E. Scarce, Parker, Pollard & Brown, P.C., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Sara E. Flannery, Assistant United States Attorney, Richmond, Virginia, for Appellee.

Before KING, Circuit Judge, HAMILTON, Senior Circuit Judge, and PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge KING wrote the opinion, in which Senior Judge HAMILTON and Judge PAYNE joined.

## OPINION

KING, Circuit Judge:

Patricia Furlong Elliott was convicted on multiple counts of making false state-

ments to a financial institution, in violation of 18 U.S.C. § 1014. On appeal, she raises several challenges to those convictions. She also appeals her sentence, contending that the district court erred both in calculating the fraud loss attributable to her conduct and in denying her an adjustment for acceptance of responsibility. The Government cross-appeals the sentence, maintaining that the court erred in awarding Elliott a downward departure based on family responsibilities. As explained below, we affirm Elliott's convictions, the court's fraud loss calculation, and the court's denial of an adjustment for acceptance of responsibility. We reverse the downward departure for family responsibilities. Because the court erred in its downward departure ruling, we vacate the sentence and remand for resentencing.

## I.

On November 8, 2001, a grand jury in the Eastern District of Virginia returned a thirty-eight count indictment against Elliott. The indictment alleged twenty-four counts of mail fraud; one count of wire fraud; and, pursuant to 18 U.S.C. § 1014, thirteen counts of making false statements to a financial institution.[1] Elliott moved to dismiss the indictment, asserting that the charges were legally insufficient. On March 12, 2002, the district court dismissed the mail fraud charges, but it au-

thorized the remaining fourteen counts to proceed. *United States v. Elliott*, Mem. Op., CR–01–327 (E.D.Va. Mar. 12, 2002) (the "Dismissal Opinion").[2] Subsequently, the Government dismissed the single count of wire fraud.[3] On April 8, 2002, following a one-day bench trial conducted on April 4, 2002, Elliott was convicted on twelve of the thirteen false statement counts (Counts 26–30 and 32–38); she was acquitted on the remaining false statement count (Count 31). *See United States v. Elliott*, Findings of Fact and Conclusions of Law, CR–01–327 (E.D.Va. Apr. 8, 2002) (the "Opinion").[4] The facts underlying Elliott's convictions, as found by the district court in its Opinion, are reviewed below.

## II.

### A.

In December of 1991, Elliott and her brother, William Furlong ("William"), discussed their need to protect the estate of their father, R. Dulany Furlong ("Mr.Furlong"), against the estate taxes that would be owed upon his death. Elliott suggested to William that they transfer their father's stock into a three-party brokerage account, on which she, William, and Mr. Furlong would each be a principal. At that time, Elliott held a power-of-attorney for her father. William agreed to the proposal, and the account was opened in January of 1992 at Wheat First Securities (the

1. A violation of § 1014 occurs when a person "knowingly makes any false statement ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, ... commitment, or loan." 18 U.S.C. § 1014.

2. The district court dismissed the mail fraud counts because they failed to "adequately link Defendant's mailings and her scheme to defraud," and because they were barred by the

applicable statute of limitations. Dismissal Opinion at 6, 11.

3. The Government dismissed the wire fraud charge pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, which provides that, "[t]he government may, with leave of court, dismiss an indictment." Fed.R.Crim.P. 48(a).

4. On April 15, 2002 and June 19, 2002, the district court amended the Opinion to make technical corrections. When referring to the Opinion, we refer to it as amended.

"Wheat First Account"). The Wheat First Account was held by the three principals in joint tenancy with the right of survivorship.[5] Pursuant to the account agreement, Wheat First authorized any one of the three principals to disburse funds from the account. Upon the direction of a principal, Wheat First would issue a check in the names of all three principals. However, the check would be negotiable only if it carried the endorsement of each of the three principals.

In addition to the Wheat First Account, Elliott also maintained at least two bank accounts at Southside Bank ("Southside"), an institution in Aylett, Virginia, insured by the Federal Deposit Insurance Corporation (the "FDIC"). One of the Southside accounts was held jointly by Elliott and Mr. Furlong (the "Elliott/Furlong Account"), and the other was held jointly by Elliott and her husband. In the nearly four-year period between the opening of the Wheat First Account in January of 1992 and Mr. Furlong's death in December of 1995, Elliott directed Wheat First to issue several checks on the Wheat First Account, which she thereafter deposited into the Elliott/Furlong Account at Southside. The Wheat First checks were all issued in the names of Elliott, William, and Mr. Furlong and, when deposited at Southside, bore the purported endorsement of all three principals. William, however, had neither endorsed the checks nor

authorized that they be endorsed on his behalf.

Southside customarily "advanced" funds to its customers in good standing, extending "immediate credit for deposits from [other] banks to [eligible] customers . . . , pending payment of the check by the [other] bank."[6] Opinion at 3. Because Elliott was a customer in good standing, she received credit on twelve of the Wheat First checks bearing William's forged endorsement (the "Forged Checks")[7] immediately after she deposited them at Southside. In its Opinion, the court found that Elliott presented the Forged Checks to Southside "desiring and knowing that she would receive immediate credit for the deposit of said checks." *Id.* at 10. The court based this finding on the fact that Elliott "wrote checks [drawn on the Elliott/Furlong Account] on the same day as the deposits were made for a greater amount than existed in the [Elliott/Furlong Account] prior to the deposits being made." *Id.* The court further found that these advances "ultimately went to [Elliott] for her own personal benefit." *Id.* at 11. In short, on twelve separate occasions, Elliott deposited a Forged Check in the Elliott/Furlong Account in order to obtain an "advance" on the funds from Southside. The total value of the Forged Checks was more than $225,000, which was credited to the Elliott/Furlong Account. Elliott utilized over $90,000 of the advanced funds, i.e., she spent more than $90,000 of the funds from the deposited Forged Checks before those

---

5. Upon the death of any principal, all property held in joint tenancy with the right of survivorship becomes the property of the remaining principal(s).

6. An advance is simply "the furnishing of money or goods before any consideration is received in return." *Black's Law Dictionary* 53 (7th ed.1999). Southside "advanced" funds when it extended credit to its customers in good standing on checks deposited from other banks before those checks cleared, i.e.,

prior to payment of those checks by the other banks.

7. For ease of reference, we refer to each individual Wheat First check containing William's forged endorsement as a "Forged Check," and we refer to the twelve forged checks that provided the basis for Elliott's § 1014 convictions collectively as the "Forged Checks."

checks had cleared.[8]

On the occasion of Mr. Furlong's funeral in December of 1995, Elliott advised William that their father's widow had transferred the funds from the Wheat First Account to a separate account in her own name. The court found that this statement was false and concluded that the statement evidenced Elliott's "intent to divert the funds in the [Wheat First Account] to herself for her personal benefit." *Id.* William did not learn of Elliott's depletion of the Wheat First Account until February of 1997, more than two years after Mr. Furlong's death. A federal investigation of Elliott's activities began soon thereafter.

During the course of the investigation, Elliott attended a June 1998 meeting with the FBI. In that meeting, she acknowledged observing "her father fraudulently endorse the [Wheat First] checks with the signature of William Furlong. She also admitted that it was likely that she also fraudulently endorsed the [Wheat First] checks with the signature of her brother." *Id.* Although Elliott advised the FBI that she used the funds to pay her father's

medical expenses, the court found this claim "not borne out by the evidence." *Id.* at 12.

### B.

On April 4, 2002, Elliott's bench trial was conducted in the Eastern District of Virginia. At trial, the district court denied Elliott's motion for judgment of acquittal. Following the trial, the court convicted Elliott on twelve of the thirteen § 1014 counts (the "False Statement Convictions"). A person violates § 1014 by "knowingly mak[ing] any false statement ... for the purpose of influencing in any way the action of ... any [FDIC-insured financial institution], ... upon any application, advance, discount, purchase, ... commitment, or loan." 18 U.S.C. § 1014. The court concluded that, in order to obtain a conviction under § 1014, the Government was obliged to prove three essential elements: (1) that Elliott made a false statement; (2) that Elliott made that statement to influence a bank's action; and (3) that Elliott made the statement knowingly. Opinion at 12.

8. In one instance, on May 20, 1994, Elliott directed Wheat First to issue a check in the sum of $30,571. On May 22, 1994, before depositing this check, Elliott wrote a check payable to herself on the Elliott/Furlong Account, in the sum of $26,500, when that account had a balance of only $861. The following day, May 23, 1994, Elliott deposited the $30,571 Wheat First check, bearing William's forged endorsement, into the Elliott/Furlong Account. That same day, Elliott deposited the $26,500 Elliott/Furlong Account check into the Southside account she held with her husband. This activity resulted in Elliott's conviction on Count 35 of the indictment.

In another instance, on January 11, 1993, Elliott wrote a check on the Elliott/Furlong Account to Moore's Cadillac, in the sum of $37,400 (the "Moore's Cadillac Check"). The Moore's Cadillac Check, which relates to Count 27 of the indictment, exceeded the El-

liott/Furlong Account's balance of $3,552. The next day, January 12, 1993, Elliott had Wheat First issue a check in the sum of $38,892. She immediately deposited this check, bearing William's forged endorsement (the "$38,892 Forged Check"), into the Elliott/Furlong Account. Although the Moore's Cadillac Check was dated January 11, the day before Elliott directed Wheat First to issue its check, the Moore's Cadillac Check was not negotiated until January 14, 1993, two days after Elliott had deposited the $38,892 Forged Check into the Elliott/Furlong Account. While it is unclear whether the $38,892 Forged Check cleared before the Moore's Cadillac Check was negotiated, the court concluded that, in depositing the $38,892 Forged Check, Elliott "intended to obtain an immediate credit ... at Southside." Opinion at 13. This conduct resulted in Elliott's conviction on Count 27 of the indictment.

The court found that the Forged Checks constituted "false statements" within the meaning of § 1014. It also determined that Elliott had "deposited [the Forged Checks] with the intent to receive immediate credit of and access to those funds." *Id.* at 13. Finally, the court found that the false statements were knowingly made, concluding that Elliott "knew that her brother did not endorse the [Wheat First] checks, yet she attempted to negotiate the checks nevertheless." *Id.* Accordingly, the court found Elliott guilty on twelve counts of violating § 1014.[9]

On April 10, 2002, Elliott renewed her motion for judgment of acquittal on Count 27, contending that the Government had failed to prove that she intended to cause or influence Southside to make an advance of funds in connection with the Moore's Cadillac Check. *See supra* note 8. The court denied the renewed motion on April 15, 2002.

### C.

On September 5, 2002, the district court conducted Elliott's sentencing hearing. During the hearing, Elliott objected to several of the recommendations contained in her pre-sentence investigation report (the "PSR"), specifically the PSR recommendations (1) that the total loss attributable to her criminal conduct (the "fraud loss") was $225,768, the face value of the Forged Checks; (2) that restitution be paid to William in the sum of $112,884, one-half of the sum of the Forged Checks; and (3) that the court deny Elliott a two-level adjustment for acceptance of responsibility (the "Responsibility Adjustment"). Additionally, Elliott sought a downward depar-

ture in her sentence so that she could care for her chronically ill husband.

At the conclusion of the sentencing hearing, the court adopted the PSR. It overruled Elliott's objections on the fraud loss calculation, the restitution award, and the denial of the Responsibility Adjustment. Elliott's base offense level was determined to be sixteen, authorizing a sentence of twenty-one to twenty-seven months imprisonment. PSR at 27. Over the Government's objection, the court granted Elliott a four-level downward departure due to her family responsibilities. The court then sentenced her to five months imprisonment, to be followed by a five-year term of supervised release. *United States v. Elliott,* Judgment in a Criminal Case, CR–01–327 (E.D.Va. Sept. 6, 2002). On September 12, 2002, Elliott moved the court for reconsideration of the fraud loss calculation. The court denied that motion on October 9, 2002.

Elliott has appealed her convictions and two aspects of her sentence. The Government has cross-appealed, contending that the court erred in awarding Elliott the four-level downward departure. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

### III.

■ We review de novo a district court's interpretation of the essential elements of 18 U.S.C. § 1014. *See United States v. Wills,* 234 F.3d 174, 176 (4th Cir.2000) ("We review the interpretation of a statute de novo."). In assessing the sufficiency of the evidence presented in a bench trial, we must uphold a guilty verdict if, taking the view most favorable to

---

**9.** The court acquitted Elliott on the thirteenth false statement count (Count 31 of the indictment). The court found that, although the evidence demonstrated that she had made a "false statement" t Southside when she de-

posited a Forged Check, the evidence failed to prove that she intended, by depositing that check, to cause Southside to advance funds to her. Opinion at 13.

the Government, there is substantial evidence to support the verdict. *United States v. Ismail*, 97 F.3d 50, 55 (4th Cir. 1996) (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

■ In considering challenges to a sentencing court's application of the Guidelines, we review factual determinations for clear error and legal issues de novo. *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir.1995). The determination of whether a defendant is entitled to the Responsibility Adjustment "is clearly a factual issue and thus reviewable under a clearly erroneous standard." *United States v. White*, 875 F.2d 427, 431 (4th Cir.1989). We are mindful that"[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," and thus that "the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, cmt. n. 5.

■ A sentencing court's interpretation of the term "loss" under the Guidelines is a legal issue, and hence is reviewed de novo. *United States v. Miller*, 316 F.3d 495, 498 (4th Cir.2003). The propriety of the court's calculation of loss, however, is a question of fact, which we review for clear error. *United States v. Godwin*, 272 F.3d 659, 671 (4th Cir.2001).

■ Finally, we review for abuse of discretion a sentencing court's decision to depart downward from the applicable Guideline range. *Koon v. United States*, 518 U.S. 81, 91, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Rybicki*, 96 F.3d 754, 756–57 (4th Cir.1996). Under *Koon*, a court's decision to depart is generally entitled to "substantial deference, for it embodies the traditional exer-

cise of discretion by a sentencing court." 518 U.S. at 98, 116 S.Ct. 2035.

## IV.

### A.

Elliott raises several challenges to her False Statement Convictions. She first contends that a check with a forged endorsement is not a "false statement" within the meaning of 18 U.S.C. § 1014. Secondly, she maintains that the Forged Checks were not presented to Southside for the purpose of "influencing" Southside's actions. Next, she contends that, in order to prove a § 1014 violation, the Government is obliged to demonstrate that the financial institution was at a risk of financial loss due to the false statement. Finally, Elliott contends that, assuming her conduct is implicated by § 1014, there was insufficient evidence to convict her on Count 27.

1.

Elliott first asserts that her False Statement Convictions must be reversed because a forged endorsement does not constitute a false statement under § 1014. In particular, she maintains that a check does not constitute a factual assertion under the statute, and that a forged endorsement on a check therefore cannot be a "false statement."

■ In support of her contention, Elliott relies almost exclusively on the Supreme Court's decision in *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). There, defendant Williams had engaged in a "check kiting" scheme, knowingly writing checks against an account that contained insufficient funds.[10] The *Williams* Court deter-

---

**10.** "Check kiting" is "the practice of playing one checking account against another, taking

mined that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 284, 102 S.Ct. 3088. A check, the Court observed, does not "make any representation as to the state of [the drawer's] bank balance," but instead simply "contains an unconditional promise or order to pay a sum certain in money." *Id.* at 284–85, 102 S.Ct. 3088 (internal quotation marks omitted). The Court therefore reversed Williams's § 1014 convictions, concluding that the statute was not "intended to put the Federal Government in the business of policing the deposit of bad checks." *Id.* at 290, 102 S.Ct. 3088 (internal quotation marks omitted).

There is a fundamental difference, however, between checks drawn on an account containing insufficient funds, on the one hand, and affirmative misrepresentations made on the check itself, on the other. As the Fifth Circuit has concluded, "*Williams* does not govern a situation in which some information on the check, such as a false signature, or a fictitious bank, is itself a false statement." *United States v. Hord*, 6 F.3d 276, 285 (5th Cir.1993) (internal quotation marks omitted). In the Fifth Circuit case, Hord had bought blank checks and a machine that encoded routing numbers, and he had used them to print bogus checks. The Fifth Circuit upheld Hord's § 1014 convictions, concluding that the holding of *Williams* is applicable only to "the simple presentation of a check drawn on an account with insufficient funds." *Id.* at 286, 102 S.Ct. 3088 (internal quotation marks omitted).

The Fifth Circuit is not alone in its interpretation and application of *Williams.* In fact, our Court has observed that "there

is nothing in *Williams* that equates the passing of checks drawn on accounts with insufficient funds with fraudulently making or altering a document." *United States v. Price*, 763 F.2d 640, 643 (4th Cir.1985); *see also United States v. Falcone*, 934 F.2d 1528, 1541 (11th Cir.), *reh'g granted & opinion vacated*, 939 F.2d 1455 (11th Cir.), *opinion reinstated on reh'g*, 960 F.2d 988 (11th Cir.1991) ("Most courts, including our own, ... have declined to read *Williams* broadly to require the reversal of convictions in situations other than those involving insufficient-funds checks."); *United States v. Worthington*, 822 F.2d 315, 316 (2d Cir.1987) (concluding that printing name of nonexistent drawee bank on check "fits squarely within the dictionary definition of 'false statement'"). In our *Price* decision, the defendant had been convicted under § 1014 for depositing false credit card sales receipts into an FDIC-insured financial institution. We upheld Price's convictions, concluding that, "unlike the checks in *Williams* which carried with them no representation, express or otherwise, as to the drawer's account balance, the credit card sales receipts ... carried with them express false representations concerning the credit card account numbers, the account owners, and the amounts of purchase." *Price*, 763 F.2d at 643.

■ Pursuant to the foregoing, an affirmative misrepresentation set forth on a check, as opposed to a check drawn on an account containing insufficient funds, constitutes a "false statement" under § 1014. Accordingly, the district court, on the evidence before it, did not err in concluding that Elliott had made false statements when she presented the Forged Checks to Southside.

advantage of bank processing delays." *United States v. Turner*, 312 F.3d 1137, 1139 n. 1 (9th Cir.2002). By carefully timing deposits and withdrawals, a person is able to create

"the appearance of funds present and immediately available for withdrawal in an account, when none in fact are there." *Id.*

### 2.

Elliott next challenges her False Statement Convictions on the basis that, even if the forged endorsements constituted false statements, her presentation of the Forged Checks did not satisfy the second element of § 1014, i.e., the checks were not deposited for the purpose of influencing Southside's actions "upon any . . . advance." In making this contention, Elliott again relies on the *Williams* decision. There, the Court observed that nothing in the legislative history of § 1014 "suggested that the statute should be applicable to anything other than representations made in connection with conventional loan or related transactions." *Williams,* 458 U.S. at 288–89, 102 S.Ct. 3088. Elliott maintains that her receipt of "immediate credit for the deposit" of the Forged Checks was not a conventional loan or related transaction, and that her convictions must therefore be reversed.

Elliott's contention fails, however, because the advances that Southside provided Elliott are plainly within the scope of the "related transactions" contemplated by the *Williams* decision. Section 1014 criminalizes the making of a false statement "for the purpose of influencing *in any way* the action of [an FDIC-insured financial institution] upon any application, *advance,* discount, purchase, purchase agreement, repurchase agreement, commitment, or loan." 18 U.S.C. § 1014 (emphasis added). This broad statutory provision expressly applies when a false statement is made for the purpose of influencing the action of an FDIC-insured financial institution upon an "advance." On similar facts, the Fifth Circuit held in *Hord* that, "acting to induce a bank to 'credit an account' can, under certain circumstances, be equivalent to acting to induce it to make an advance, commitment, or loan." 6 F.3d at 283–84. When a financial institution provides its customer with access to funds before the customer's deposit clears, the institution "is making an advance on the security of the checks it holds for collection." *Id.* at 284.

After hearing the evidence, the district court found that Elliott had presented the Forged Checks to Southside "desiring and knowing that she would receive immediate credit for the deposit of said checks." Opinion at 10. Thus, presentation of the Forged Checks constituted false statements "for the purpose of influencing" Southside to "advance" Elliott the value of those checks. As a result, Elliott's challenge to the False Statement Convictions on this basis must fail.

### 3.

Elliott next maintains that, under § 1014, the Government is required to prove that the financial institution suffered a risk of financial loss. Elliott premises her argument on the requirement that, in order to prove bank fraud under 18 U.S.C. § 1344, the Government must show that a financial institution was at risk of financial loss.[11] *See United States v. Brandon,* 298 F.3d 307, 312 (4th Cir.2002) (observing that, pursuant to § 1344, "it is sufficient for the government to show that a financial institution was exposed to an actual or potential risk of loss" (internal quotation marks omitted)). She contends that we should read this § 1344 element into § 1014, and she maintains that, in this instance, Southside was never at risk of any such loss.

---

**11.** Section 1344 of Title 18, in pertinent part, renders criminally liable:

(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution. . . .
18 U.S.C. § 1344(a)(1).

Risk of loss is not an express statutory requirement for conviction under either § 1344 or § 1014. But because we have held that risk of financial loss must be proven under § 1344, Elliott contends it would be illogical not to require such proof under § 1014. We disagree. Section 1344 criminalizes the execution of a scheme to *defraud* a financial institution, while § 1014 criminalizes the making of a false statement to a financial institution "for the purpose of influencing in any way the action of" the institution with regard to, for example, an advance or a loan. The term "defraud" signifies "the deprivation of something of value by trick," *see United States v. Orr,* 932 F.2d 330, 332 (4th Cir. 1991) (internal quotation marks omitted), thus implying the need to demonstrate a risk of financial loss. "Influence," on the other hand, bears no such connotation. These statutes are fundamentally different, and the element read by the courts into § 1344—that a financial institution be put at risk of financial loss—does not compel us to read that same element into § 1014.

Our assessment of § 1014 finds support in Supreme Court precedent. The Court has concluded that, under § 1014, a false statement need not be material to a financial institution's decision to advance or loan funds. *United States v. Wells,* 519 U.S. 482, 490, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) ("Nowhere does [§ 1014] say that a material fact must be the subject of the false statement or so much as mention materiality."). It is difficult to discern how any immaterial false statement, i.e., a statement incapable of influencing a financial institution, *see id.* at 489, 117 S.Ct. 921, could possibly place such an institution at any risk of financial loss. Because materiality is not an essential element of § 1014, it would be nonsensical for us to require the Government to nonetheless prove that the financial institution faced a risk of financial loss. We decline to do so.

### 4.

Finally, as regards her False Statement Convictions, Elliott contends that there was insufficient evidence to support her conviction on Count 27 of the indictment. *See supra* note 8. With respect to her other False Statement Convictions, the Government demonstrated that, when Elliott deposited a particular Forged Check in the Elliott/Furlong Account, she also wrote checks on that account "exceeding the pre-deposit account balance, which were posted ... on the same day as the deposit was made." Opinion at 13. With respect to Count 27, by contrast, no check was posted on the day of the relevant Forged Check deposit. Rather, on January 11, 1993, Elliott wrote the Moore's Cadillac Check for $37,400 on the Elliott/Furlong Account, even though the account balance was only $3,552. The next day, January 12, 1993, she directed Wheat First to issue a check in the sum of $38,892. After William's endorsement was forged thereon, she deposited that check into the Elliott/Furlong Account. It was not until January 14, 1993, that the Moore's Cadillac Check was negotiated. Elliott asserts that, because the Elliott/Furlong Account did not fall below its pre-deposit limit until two days after the $38,892 Forged Check was deposited, the evidence was insufficient to prove that she intended to "influence" Southside to make an advance.

The court found that Elliott had deposited each of the Forged Checks into the Elliott/Furlong Account "desiring and knowing that she would receive immediate credit for the deposit of said checks." *Id.* at 10. In depositing the Wheat First check underlying Count 27, Elliott received immediate credit from Southside in

the full amount thereof. It is immaterial under § 1014 whether Elliott utilized the advanced funds; it is relevant only that Elliott's *purpose* in depositing the $38,892 Forged Check was to influence Southside to make the advance. 18 U.S.C. § 1014 (violation occurs when a person "knowingly makes any false statement ... for the *purpose* of influencing in any way the action of ... [an FDIC-insured financial institution] ... upon any ... advance"). Viewed in the light most favorable to the Government, the facts relating to the Moore's Cadillac Check show that Elliott deposited the $38,892 Forged Check for the purpose of causing Southside to advance her funds. In these circumstances, we affirm Elliott's conviction on Count 27.

### B.

Elliott also challenges her sentence in two respects. Specifically, she maintains that the court erred both in denying her the Responsibility Adjustment and in calculating her fraud loss. We address each of these contentions in turn.

### 1.

Elliott first challenges the district court's refusal to award her the Responsibility Adjustment, pursuant to U.S.S.G. § 3E1.1 (1993). She maintains that she never contested the facts underlying her False Statement Convictions, and that she argued at trial only that her conduct did not, as a matter of law, contravene § 1014. The Government asserts, by contrast, that Elliott never accepted full responsibility for her conduct, and that she falsely denied her relevant conduct (pursuant to U.S.S.G. § 1B1.3). Under such circumstances, the Government insists, the court did not clearly err in refusing to award her the Responsibility Adjustment.

Section 3E1.1 of the Guidelines provides that a defendant who "clearly dem-

onstrates acceptance of responsibility for his offense" is entitled to a two-level reduction in his base offense level. U.S.S.G. § 3E1.1. Generally, this adjustment is inappropriate where "a defendant ... puts the government to its burden of proof at trial by denying the essential factual elements of guilt." *Id.* at § 3E1.1, cmt. n. 2. In rare cases, however, a defendant may exercise his right to trial and yet nevertheless be entitled to the Responsibility Adjustment. Such a situation occurs "where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.*

The PSR recommended against Elliott receiving the Responsibility Adjustment. In her first post-trial interview with the probation officer, Elliott "made no statement concerning the instant offense upon the advice of counsel." PSR at 17. At a second interview, she submitted a written statement to the probation officer, stating in part:

> I accept responsibility for depositing checks into Southside Bank for the purpose of receiving immediate credit for funds without waiting for the checks to clear, thus putting the bank in the position of risk. ... I witnessed my father sign these checks for my brother. I accept responsibility that, without knowing whether or not my father had Power of Attorney for my brother; in retrospect these checks may have constituted a false statement to Southside Bank. ...

PSR at 17–18. The probation officer concluded that Elliott's "written statement, combined with the facts and circumstances of this case, fail[ed] to meet the threshold required for an adjustment for Acceptance of Responsibility." *Id.* at 18. In response to Elliott's objection to the PSR, the pro-

bation officer maintained that, "although the defendant may have proceeded to trial to preserve either a constitutional or legal issue, the defendant [had] not adequately admitted to her criminal conduct as required to receive this adjustment." *Id.* at A–2.

The court overruled Elliott's objection to the PSR's recommendation that the Responsibility Adjustment be denied. In so doing, the court stated that, "of course, the defendant has a right to say basically what she has said, 'I didn't do it,' and live with that. But she is not entitled to Acceptance of Responsibility based on these facts."

The commentary to the Guidelines explains that, in order to be eligible for the Responsibility Adjustment, "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction.... However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n. 1. Elliott asserts that the court, in declining to award her the Responsibility Adjustment, was requiring that she admit to relevant conduct beyond the offense of conviction. She contends that, contrary to the court's conclusion, her acceptance of responsibility was clearly demonstrated by the facts that: (1) she offered to agree to numerous stipulations, including that William did not sign the Forged Checks; (2) she neither took the stand nor called any witnesses to dispute the evidence presented by the Government; and (3) she admitted to the essential elements of her convictions in the statement submitted to the probation officer.

Elliott is correct that, under the Guidelines, she would be entitled to the Responsibility Adjustment, despite exercising her right to trial, if she admitted the factual elements of the charges against her and did not falsely deny her relevant conduct. However, Elliott *did* falsely deny certain aspects of her relevant conduct. In her 1998 FBI interview, Elliott admitted both that she had observed her father endorse several Wheat First checks with her brother's signature, and that it was likely that she also fraudulently endorsed some Wheat First checks with William's signature. After trial, however, she admitted to the probation officer only that she had "witnessed [her] father sign these checks for [her] brother," thus implicitly denying her own, previously acknowledged role in the forgeries. PSR at 17–18. Pursuant to the Guidelines, a denial of relevant conduct is "inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n. 1. Because of the sentencing court's "unique position" in evaluating an issue of acceptance of responsibility, and according the court the "great deference" to which it is entitled, it did not clearly err in denying Elliott the Responsibility Adjustment. *See id.* § 3E1.1, cmt. n. 5.

### 2.

Elliott lastly contends that the court erred in calculating the fraud loss attributable to her conduct. She asserts that the court erroneously considered William, rather than Southside, to be the "victim" of her crime and that, as a result, the fraud loss was overstated. Elliott maintains that, had the court properly recognized Southside as the victim, it would have found the fraud loss to be zero. The Government responds that the court properly deemed William a victim, and hence that it correctly calculated the fraud loss at $225,768, the face value of the Forged Checks.

Pursuant to § 2F1.1(b)(1) of the applica-

ble 1993 Guidelines,[12] a sentencing court is obliged to calculate the offense level of a defendant convicted of a crime involving fraud or deceit on the basis of the amount of loss resulting from the scheme. The Guidelines' commentary explains that the applicable fraud loss "need not be determined with precision." U.S.S.G. § 2B1.1, cmt. n. 3. A sentencing court must simply "make a reasonable estimate of the loss, given the available information." *Id.*

In Elliott's PSR, the probation officer recommended that the fraud loss be calculated as the face value of the Forged Checks. The PSR determined that the "victim" of the offense was William, and "that the actual or intended loss [was] the amount of the cashed checks constituting the counts of conviction."[13] PSR at A–1. Elliott objected to this fraud loss calculation, asserting that the victim of her criminal activity was Southside, which had suffered no loss. The court overruled Elliott's objection on this point and adopted the PSR.

 In calculating fraud loss, a sentencing court must determine what sum the defendant extracted, or attempted to extract, through commission of his or her offense. Under the Guidelines, the "offense" includes not only the offense of conviction, but also all relevant con-duct. U.S.S.G. § 1B1.1, cmt. n. 1(*l*). And relevant conduct includes "all acts and omissions committed ... by the defendant ... that occurred during the commission of the offense of conviction." *Id.* § 1B1.3(a)(1).

Elliott's actions in improperly obtaining funds from the Wheat First Account occurred "during the commission of [her] offense of conviction." *Id.* Accordingly, it was appropriate for the court, in calculating the fraud loss, to consider not only the losses suffered by Southside, but also those suffered by William and Mr. Furlong as well.

 Elliott also asserts that, even if the court could properly consider the losses of William and Mr. Furlong, the full value of the Forged Checks is not the appropriate fraud loss sum because she held an ownership interest in the Wheat First Account. To the contrary, Elliott had no legal right to any of the funds in the Wheat First Account, absent William's valid endorsement. Under Virginia law, a joint account "belongs, during the lifetimes of all parties, to the parties in proportion to the net contributions by each to the sums on deposit." Va.Code Ann. § 6.1–125.3. Here, Mr. Furlong was responsible for all of the deposits made to the Wheat First Account and, accordingly, the funds in that account "belonged" to him. Unless and until each of the three principals endorsed the checks on the Wheat First Account, Elliott had no ownership interest in the funds. Thus, the court appropriately utilized the full value of the Forged Checks in calculating the fraud loss.

## V.

Finally, the Government has cross-appealed Elliott's sentence, maintaining that the court abused its discretion in departing

**12.** Although a sentencing court generally is required to apply the Guidelines Manual that is in effect on the date of sentencing, it must instead apply the Guidelines Manual "in effect on the date that the offense of conviction was committed," if it determines that use of the Guidelines Manual "in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution." U.S.S.G. § 1B1.11. The PSR recommended application of the 1993 Guide-

lines Manual because the Guidelines Manual in effect at the time of sentencing was "less advantageous to the defendant." PSR at 30. The district court adopted the PSR, and thus it applied the 1993 Guidelines Manual.

**13.** The Guidelines provide that the "loss" is the greater of the actual loss or the intended loss. U.S.S.G. § 2F1.1, cmt. n. 7.

downward four levels on the basis of Elliott's family responsibilities. Elliott responds that it was proper for the court to award her the downward departure since she is the primary caregiver for her chronically ill husband.

■ Pursuant to the Guidelines, a sentencing court is ordinarily required to impose sentences within the applicable Guideline range. The Guidelines seek "to anticipate a broad range of typical cases—a 'heartland'—that is representative of the circumstances and consequences of ordinary crimes of the type to which the guideline applies." *Rybicki,* 96 F.3d at 757. A sentencing court may depart from the applicable range only when it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *United States v. Wilson,* 114 F.3d 429, 432 (4th Cir.1997) (internal quotation marks omitted).

■ In determining whether a departure is appropriate, the sentencing court must first establish "whether the potential basis for departure was forbidden, encouraged, discouraged, or unmentioned by the Commission." *Id.* at 433. Here, the court departed on the basis of Elliott's family responsibilities, namely, her role as the primary care-giver for her ill husband. In this regard, the Guidelines provide that "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. Accordingly, the basis used by the court for Elliott's departure is a "discouraged" factor. Where a factor is discouraged, "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon,* 518 U.S. at 96, 116 S.Ct. 2035. We have previously determined that a departure on the basis of family responsibilities is "permitted only upon a finding that the defendant's family ties or responsibilities are extraordinary." *Wilson,* 114 F.3d at 434.

At her sentencing hearing, Elliott moved for a downward departure on the basis of several factors. Following its consideration of Elliott's argument and the Government's objection, the court granted the downward departure, stating:

> The one thing that did move me was the health and care of the family member, which is an appropriate basis for departure. And what I am going to do is depart downward by four from a Level 16 to a Level 12, which will give me a little bit more flexibility when it comes to imposing the sentence.

In so ruling, however, the court failed to make any findings regarding the severity of the family member's illness, or the nature of the care that Elliott provides for him.

The court heard evidence that Elliott's husband, Joseph, had suffered a massive heart attack in 1996; that he required five-way bypass surgery; and that he was subsequently diagnosed with cancer. Joseph had undergone extensive radiation and chemotherapy treatment for cancer, and as a result, he continued to suffer "severe periods of confusion and memory loss." At the time of sentencing, the cancer was apparently in partial remission. Approximately a month before the sentencing hearing, however, Joseph was diagnosed with diabetes. According to the evidence, Elliott was Joseph's primary caregiver, and due to his incapacity, his memory loss, and his confusion, she was responsible for administering his medication and supervising him on a daily basis.

■ A downward departure for family responsibilities is permissible only where the court finds that the family responsibilities are "extraordinary." *See*

*Wilson,* 114 F.3d at 434. Generally, a sentencing court may depart downward on this basis only if it finds that the defendant is essentially "irreplaceable." *See United States v. McClatchey,* 316 F.3d 1122, 1133 (10th Cir.2003) (reversing downward departure for defendant to care for his son because nothing in record "suggest[ed] that another individual could not provide the necessary assistance in [defendant's] absence"); *United States v. Pereira,* 272 F.3d 76, 82 (1st Cir.2001) (reversing downward departure because "[t]he nature of the care that [defendant] renders (shopping, cleaning, food preparation, etc.) is not so highly specialized as to make him difficult to replace"); *United States v. Sweeting,* 213 F.3d 95, 104 (3d Cir.2000) (reversing downward departure based on responsibility in caring for child with Tourette's Syndrome because nothing indicated that the defendant was "so irreplaceable that her otherwise ordinary family ... responsibilities are transformed into the 'extraordinary' ").

 Although we sympathize with Elliott's situation, this record fails to demonstrate that the care she provides to Joseph is "irreplaceable." *See Rybicki,* 96 F.3d at 759 (reversing downward departure granted on basis of family responsibilities because record did not indicate that factor was present to exceptional degree). To the contrary, the record reflects that Elliott has a strong family and community support network, evidenced by the testimony of her daughter and granddaughter, and by affidavits of, among others, her son-in-law and various friends. In fact, Elliott's son-in-law stated by affidavit that both Elliott and Joseph "are welcome to live with [him and his wife] if the need arises." Indeed, in sentencing Elliott to five months of imprisonment, the court acknowledged that Elliott is able to rely on others to care for Joseph. *See Pereira,* 272 F.3d at 83 (concluding that, by requiring defendant be confined to home every

weekend, court "acknowledged ... that [defendant] was able to rely on others to care for his parents in his absence"). In these circumstances, the sentencing court abused its discretion in granting Elliott a four-level downward departure, and we reverse that aspect of Elliott's sentence.

### VI.

Pursuant to the foregoing, we affirm Elliott's False Statement Convictions, the court's fraud loss calculation, and its denial of the Responsibility Adjustment. We reverse the downward departure to Elliott based on her family responsibilities, we vacate her sentence, and we remand for resentencing.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED*